T.C. Memo. 2015-231

UNITED STATES TAX COURT

JOHN M. ALTERMAN TRUST U/A/D MAY 9, 2000, RONALD GORDON
AND DONALD GAVID, TRUSTEES, TRANSFEREE, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 6936-10,  6940-10,        Filed December 1, 2015.
            7071-10, 20636-11.

<u>Michael Todd Welty</u>, <u>Kristina L. Novak</u>, and <u>Denise M. Mudigere</u>, for

petitioners in docket Nos. 6936-10, 7071-10, and 20636-11.

<u>Jenny L. Johnson</u> and <u>Guinevere M. Moore</u>, for petitioner in docket No.

6940-10.

---

[1]Cases of the following petitioners are consolidated herewith:  Bryan S.
Alterman Trust U/A/D May 9, 2000, Bryan S. Alterman, Trustee, Transferee,
docket No. 6940-10; Richard C. Alterman Trust U/A/D May 9, 2000, Richard C.
Alterman, Trustee, Transferee, docket No. 7071-10; and Estate of John Marks
Alterman, Deceased, Melvin S. Black, Personal Representative, Transferee, docket
No. 20636-11.

[*2]   David B. Flassing, Angela B. Reynolds, Catherine Marie Thayer, and

Steven Rex Guest, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


BUCH, Judge:  Courts, including this court, have been plagued by Midco

cases.  Rarely do these cases present themselves for a determination of the

underlying liabilities.  Instead, these cases are postured so that the courts are asked

to determine whether someone other than the taxpayer should be on the hook for

the taxpayer's liability.  They are transferee liability cases, and so are these cases.

The fact patterns of these cases are similar.  Someone sells an interest in a

corporation for a good price; the corporation doesn't pay its taxes; and the Internal

Revenue Service (IRS) goes after the former shareholder for the taxes.

The outcomes of these cases vary.  Many taxpayers have prevailed at the

trial court, but many of those taxpayers have seen their victories turned to defeat

on appeal.[2]  The IRS has likewise prevailed at the trial court, and its victories have

---

[2]Slone v. Commissioner, ___ F.3d ___, 2015 WL 5061315 (9th Cir. Aug.
28, 2015), vacating and remanding T.C. Memo. 2012-57; Salus Mundi Found. v.
Commissioner, 776 F.3d 1010 (9th Cir. 2014), rev'g and remanding T.C. Memo.
2012-61; Diebold Found., Inc. v. Commissioner, 736 F.3d 172 (2d Cir. 2013),
vacating and remanding Salus Mundi Found. v. Commissioner, T.C. Memo. 2012-
(continued...)

**[\*3]** uniformly survived appeal.[3]  Rarest of all is the taxpayer victory that survives

appeal.[4]

But each case stands on its own.  Outcomes are determined by the facts of

each specific case and what is established by the record.[5]

These consolidated cases present unique facts and evidentiary holes that

distinguish them from those cases where the IRS ultimately prevailed.  First, the

record is clear that petitioners took steps to ensure that the IRS was paid what it

was due, even if those steps were ultimately unsuccessful.  Second, because

petitioners did not receive a transfer from the company they sold, direct transferee

liability cannot be established.  Third, to prevail under a "transferee of a

---

[2](...continued)
61; Frank Sawyer Trust of May 1992 v. Commissioner, 712 F.3d 597 (1st Cir. 2013), rev'g and remanding T.C. Memo. 2011-298.

[3]For a recent example, see Feldman v. Commissioner, 779 F.3d 448 (7th Cir. 2015), aff'g T.C. Memo. 2011-297.

[4]Starnes v. Commissioner, 680 F.3d 417 (4th Cir. 2012), aff'g T.C. Memo. 2011-63.

[5]See, e.g., Holden v. Commissioner, T.C. Memo. 2015-83, at \*2 n.2; Holden v. Commissioner, T.C. Memo. 2015-131, at \*2 n.1 (noting that separate cases involving the same taxpayer and issues each turn on the facts established by the record in each separate case); see also Feldman v. Commissioner, T.C. Memo. 2011-297, 2011 WL 6781006, at \*17 (noting different outcomes in Midco cases because of the distinct facts and circumstances of each case).

**[\*4]** transferee" theory, the Commissioner must prove that there was a fraudulent transfer at each step along the way, and the Commissioner failed to prove that the purchasers of the company were insolvent or approaching insolvency at any relevant time. Indeed, the Commissioner failed to prove that the taxpayer company was insolvent. It is these evidentiary holes that require that we hold for petitioners.

## FINDINGS OF FACT

### I. Alterman Corp. Background

In 1938 Sidney Alterman (Mr. Alterman, Sr.) founded the businesses that would later become part of an affiliated group controlled by Alterman Corp. (AC). Mr. Alterman, Sr. started this business with a single truck and grew it into a national freight hauling company that transported perishable foods across the United States. AC's primary assets were trucks, tractors, trailers, and real estate that served as terminals. Mr. Alterman, Sr. incorporated AC in 1986 under Florida law, and AC based its business in Miami, Florida. AC became the parent of Transport Realty Co. and Alterman Transport Lines, which in turn held the wholly owned subsidiary Reefer Division. AC and its subsidiaries were treated as C corporations under the Internal Revenue Code.

**[*5]** Mr. Alterman, Sr. had three sons: John, Bryan, and Richard. John was an attorney and acted as general counsel for AC, but he developed Parkinson's disease and had to quit working in 1997. Bryan was educated as a social worker. He served on the board of directors for AC and was vice president of operations for Alterman Transport Lines until approximately 1988, when he had to quit after suffering multiple bouts of cancer. Middle son Richard had a Ph.D. in the history and philosophy of American education, and he worked in the academic world until taking a position at Alterman Transport Lines as vice president in 1984.

In May 2000 Mr. Alterman, Sr. created the Sidney Alterman Irrevocable Trust for the benefit of his three sons. Mr. Alterman, Sr. funded this trust with a significant portion of AC stock. The trust instrument provided that a trust would be created for each of the beneficiaries upon Mr. Alterman, Sr.'s death.

In addition, Mr. Alterman, Sr.'s will provided that a trust would be created for each of his sons upon his death, and each of these trusts would receive one-third of 50% of his residuary estate.[6]

Mr. Alterman, Sr. died in 2001. Immediately before his death, AC was owned as follows:

---

[6]The probate court accepted a revised will that Mr. Alterman, Sr. had never signed as his final will, which provided for these three separate trusts as well, with slightly different terms.

[*6]

| Shareholder | Ownership of shares outstanding (percent) |
|---|---|
| Sidney Alterman Irrevocable Trust | 78.17 |
| Sidney Alterman | 10.22 |
| John Alterman | 3.83 |
| Richard Alterman Revocable Trust | 3.86 |
| Bryan Alterman Revocable Trust | 3.88 |
| John Alterman Trust U/A/D 12/27/95 | 0.05 |

The Alterman brothers each had two trusts for their benefit following the death of Mr. Alterman, Sr.:  their preexisting interest in the Sidney Alterman Irrevocable Trust and the trusts that were created under the terms of Mr. Alterman, Sr.'s will.  They agreed to consolidate their interests into one trust apiece instead of two.  The Sidney Alterman Irrevocable Trust remained in existence for administrative convenience well after Mr. Alterman, Sr.'s death.  The Alterman brothers chose to separate it into three separate trusts for filing purposes in November 2003.  These three separate trusts are the petitioner trusts in these cases, the John M. Alterman Trust U/A/D May 9, 2000, the Bryan S. Alterman Trust U/A/D May 9, 2000, and the Richard C. Alterman Trust U/A/D May 9, 2000.[7]

---

[7]The share purchase agreement executed December 5, 2003, lists the sellers as:  the Sidney Alterman Irrevocable Trust, Mr. Alterman, Sr.'s Estate, John Alterman individually, the Richard Alterman Revocable Trust, the Bryan Alterman

(continued...)

**[*7]**  When Mr. Alterman, Sr. died, his family was faced with an estate tax bill of $12,502,994.  Considering the estate's significant tax liability and the fact that most of the estate's assets were tied up in AC stock, the estate borrowed $12,502,994 from AC to pay the tax bill.  AC reflected this transaction as a note receivable on its balance sheet.

## II.  Decision To Sell AC

Richard Alterman became president and chairman of the board of AC after his father's death in 2001, and he remained in that position until AC's stock was sold to MidCoast Investments, Inc. (MidCoast), on December 5, 2003.  Like his older brother John, Richard was stricken with Parkinson's disease, and the youngest brother, Bryan, had long been sidelined battling multiple bouts of cancer.  Faced with the loss of their father, their own failing health, the loss of working capital in the business due to the necessity of borrowing corporate funds to satisfy

---

[7](...continued)
Revocable Trust, and the John Alterman Trust U/A/D 12/27/95.  This fact is relevant because the Commissioner argues that the three petitioner trusts, the John M. Alterman Trust U/A/D May 9, 2000, the Bryan S. Alterman Trust U/A/D May 9, 2000, and the Richard C. Alterman Trust U/A/D May 9, 2000, are transferees of transferees (Sidney Alterman Irrevocable Trust and the Estate of Sidney Alterman from AC), whereas the Commissioner argues that the Estate of John Marks Alterman is an initial transferee (from AC).

[*8] the estate tax liability, and the declining profitability in the operations of AC, the Alterman brothers decided to sell AC.

Richard hired Carter Morse & Co. to help find a buyer and publicly announced that AC would be sold and cease operations on December 4, 2002. The Altermans' primary contact at Carter Morse was Frank Morse, a managing director who had a background in finance and banking and who specialized in financial advisory services for mergers, acquisitions, and divestitures. Although Carter Morse presented the Altermans with two or three potential buyers, the Altermans did not reach a deal with any of them.

After the decision to sell had been made and the process was under way, the Alterman brothers decided that it would be best to sell the assets of AC; the Altermans had run sale scenarios that showed they could get a better price this way than if they sold AC outright. These scenarios always included payment of all of AC's tax liabilities. Over the course of 2003, AC sold all of its trucks and terminals, resulting in capital gains.

The Altermans also retained the Berger Singerman law firm to represent and advise them during the sale process and to ensure that AC complied with its obligations under the Worker Adjustment and Retraining Notification Act (WARN

[*9] Act).[8]  The main attorneys that worked for the Altermans on the sale of AC were Robert Barron, Nick Jovanovich, and Sheldon Polish.  Mr. Barron was a veteran in the corporate law field with experience in both buy- and sell-side transactions, and he also served as chair of the Business Law Section of the Florida Bar Association's Legal Opinion Standards Committee.  Both Mr. Jovanovich and Mr. Polish were tax attorneys.  Mr. Jovanovich, in addition to being a tax lawyer, was a licensed certified public accountant (C.P.A.), had an LL.M. in taxation, was certified by the Florida Bar Association as a tax attorney, and had approximately 30 years' experience in corporate tax and tax controversy.  Mr. Polish had approximately 40 years' experience and also was a C.P.A.  He specialized in income tax law and had previously worked for the IRS, Ernst & Young, and Greenberg Traurig, and he helped dozens of clients sell their business interests.

Finally, AC's longtime accountants, Lefcourt, Billig, Tiktin & Yesner, P.A., assisted the Altermans in the sale process.  Jeffrey Lefcourt had known the

---

[8]The Worker Adjustment and Retraining Notification Act (WARN Act), Pub. L. No. 100-379, secs. 1-10, 102 Stat. at 890-894 (1988), requires that a covered employer send employees notice of its intention to cease operations and terminate their employment at least 60 days before doing so.  The WARN Act sec. 3 was amended by the Workforce Innovation and Opportunity Act, Pub. L. No. 113-128, sec. 512(kk), 128 Stat. at 1722 (2014).

[*10] Alterman family since he was a child, and his firm became AC's accountants in the early 1990s.

Ultimately, these advisers presented the shareholders with two bids to purchase their shares from two potential purchasers: MidCoast Investments, Inc. (MidCoast), and the Diversified Group, Inc. (Diversified).

III.     Negotiations With MidCoast and Diversified

MidCoast learned that AC was planning to sell, and it initially approached Mr. Lefcourt to make a bid.

Mr. Polish had previously dealt with Graham Paul Wellington, a MidCoast representative, and Mr. Polish had a favorable impression of Midcoast. After the initial overtures, MidCoast and AC's attorneys began negotiating a deal for MidCoast to buy AC's stock and reengineer AC into an asset recovery business.

After several meetings over a period of six months that included Richard Alterman, members of the AC team of attorneys and advisers, and Donald Stevenson and Mr. Wellington of MidCoast, Mr. Stevenson presented the Alterman team with a letter of intent from MidCoast to purchase the AC shares.

MidCoast described its plan for a viable business and provided significant representations, warranties, and covenants to the shareholders. MidCoast represented that it had been in the financial services business for many years and

[*11] that it was "among the top 25 largest purchasers of delinquent consumer receivables in the United States." MidCoast explained that it wanted to purchase the shares of AC because it wanted to enter into a joint venture agreement to purchase distressed credit card receivables and that MidCoast needed to quickly purchase this debt. At trial Mr. Jovanovich testified:

> My understanding is that MidCoast, because they had a history of acquiring businesses that were in the debt recovery service business, that they intended in the initial phase to avail themselves of write-offs, legitimate write-offs. And to the extent that there was any tax liability that was required to be reported on the 2003 tax return, that that tax liability would be fully paid by the company.

MidCoast described its business plan as a deferral of tax and not an elimination of AC's putative tax.

The Altermans' advisers spent time performing due diligence on MidCoast and what it planned to do. Mr. Morse contacted MidCoast references to get their impressions of MidCoast. Mr. Barron was reassured by the fact that MidCoast was represented by what he considered to be a reputable law firm, Akerman Senterfitt, and that the escrow agent being used was another reputable firm, Morris, Manning & Martin, LLP. Mr. Barron also testified that when he met Mr. Stevenson, he was "a sharp, impressive person." Mr. Barron generally understood MidCoast's business plan, and the Altermans' tax attorneys, Mr. Jovanovich and

**[*12]** Mr. Polish, understood that there were legitimate ways that MidCoast could achieve its business plan.

Mr. Barron generally understood that "MidCoast was an experienced collector of delinquent credit card receivables" and would defer AC's taxable gain through this business model. He understood that "MidCoast had arrangements with the banking organizations that they did either a joint venture of [sic] some type of transaction with the banking organization where they would put credit card receivables into Alterman Corporation." MidCoast would use the cash in the target companies to buy the receivables or interests in the joint venture that owned the receivables. "And that there would be a write down of those credit card receivables based upon collectability * * * [which] would cause a deferral of the tax."

Mr. Jovanovich testified that the tax "deferral sounded plausible, absolutely, particularly in pre-2004." He further explained that the tax deferral was "plausible because there were certainly avenues to defer the tax, and one of the avenues which existed back then was the ability to do partnerships, contribute built in losses, and keep the inside basis at a high amount".

Mr. Polish understood MidCoast's plan to include "startup phase" writeoffs. MidCoast's representatives explained that "over the years, that they have been

**[*13]** doing this business, that at the time of the acquisition of this, that there were certain things that could be written off in the startup phase of the business that wouldn't be actually worth anything in the future." Then after the initial writeoff, the business would begin generating income in the subsequent years and then "they'd have to pay the tax." Mr. Polish, a seasoned and experienced tax lawyer and C.P.A., thought that MidCoast's tax deferral plan "sounded reasonable".

Mr. Lefcourt, the accountant for AC and the Altermans' longtime family friend, understood MidCoast's business model to be buying delinquent credit card receivables and "that there were early write-offs, which would defer * * * much of that tax, if not all of that tax, to a later period. And therefore, they could use all the money that they got in the purchase, towards their * * * activities."

The MidCoast representatives' assurances that MidCoast had a history of success in this business bolstered the confidence of the Altermans' attorneys and advisers. Mr. Polish believed that MidCoast would operate AC and that it was a "g[o]ing concern that was solvent that could pay the taxes." Mr. Jovanovich testified that he did not believe Notice 2001-16[9] applied to this transaction because

---

[9]Notice 2001-16, 2001-1 C.B. 730, Intermediary Transactions Tax Shelter, indicated that the IRS may challenge certain intermediary transactions and their reported tax results and that the IRS designates these transactions as "listed transactions" for purposes of section 1.6011-4T(b)(2), Temporary Income Tax

(continued...)

**[\*14]** there was no intermediary, no plan to use an intermediary, and no plan to avoid paying the tax liability.

The final purchase price for the AC shares was $4,989,331. MidCoast used the following purchase price formula: cash plus estimated tax prepayments minus 44.5% of AC's 2003 projected income tax liability.

While these negotiations were ongoing, Mr. Morse presented the Altermans with a rival bid from Diversified to purchase their shares. Diversified's bid would give the Alterman shareholders approximately $1 million more than MidCoast's bid.[10] Diversified sent the Altermans' advisers a copy of a memo it had prepared to show that its proposal was distinguishable from the transaction in Owens v.

---

[9](...continued)
Regs., 65 Fed. Reg. 11207 (Mar. 2, 2000), and section 301.6111-2T, Temporary Income Tax Regs., 65 Fed. Reg. 11218 (Mar. 2, 2000).

[10]This differential was based on a comparison of Diversified's bid and MidCoast's initial bid. MidCoast later increased its purchase price. MidCoast claimed in its September 30, 2003, letter to Mr. Barron that it was "being presented with opportunities to purchase charged-off receivables at attractive prices due to a soft market and the need for certain banks to report increased earnings in the third and fourth quarters. MidCoast is prepared to pass onto the Shareholders such savings".

[*15] <u>Commissioner</u>.[11]  Mr. Jovanovich, however, "vehemently disagreed with

* * * [Diversified's] analysis."

The Altermans' advisers told MidCoast about Diversified's bid.  In

response, MidCoast in a letter dated September 30, 2003, told the Altermans that

MidCoast "has no competitors" and that other transactions were tax shelters.  In

this letter MidCoast also promised it would provide the Alterman shareholders

with a postclosing cash pro forma showing how the new asset recovery business

would operate, which it did.  MidCoast wrote in this letter that the pro forma

financial statement was "based on actual historical experience, as well as industry-

wide data."  At this point, the Altermans' attorneys did further research into

transferee liability and determined that Diversified's offer lacked economic

substance and business purpose.

The Altermans' attorneys met again with Diversified and asked Diversified

to further describe its business and to provide them with guaranties:  (a) that AC

would not be dissolved for at least three years; (b) that AC would reinvest net

cashflows for at least three years; (c) that no actions would be taken to cause

---

[11]568 F.2d 1233, 1237 (6th Cir. 1977) (finding that "[a] taxpayer, working within the law, may legitimately seek to avoid taxes", however "[w]hat the law does not permit a taxpayer to do * * * is to cast transactions in forms when there is no economic reality behind the use of the forms"), <u>aff'g in part, rev'g in part</u> 64 T.C. 1 (1975).

[*16] transferee liability; and (d) that AC would retain a specified amount of cash to pay its tax liabilities after the sale.  Diversified refused, and consequently the Altermans declined to move forward with Diversified despite its higher offer.  Indeed, Mr. Lefcourt recalled that Diversified "didn't want to talk about what their business was.  Almost like it was none of our business.  And they [the Berger Singerman attorneys] got terribly concerned about it."

MidCoast, by contrast, provided the Altermans with significant representations, covenants, and warranties, some of which MidCoast offered initially and others for which the Altermans' advisers negotiated.  MidCoast met with the Altermans' advisers again on October 7, 2003.  Not only in person at that meeting but also in further correspondence, MidCoast promised that AC would not be dissolved after the sale but would continue in accordance with the representations made to the selling shareholders.

Indeed, this promise was memorialized.  The Altermans' attorneys fought for an ongoing corporate net worth requirement of $1.5 million continuing at least four years after the sale to ensure that "the purchaser was going to cause the corporation to pay the deferred tax liability as it went due."  The advisers wanted to ensure "that the purchasers had the wherewithal in order to effectuate that payment", and it was "critically important" to both the advisers and the Altermans.

[*17] The minimum net worth requirement was there to make sure funds were "available to pay * * * any of that tax liability that was due at the end of the year". Mr. Barron drew additional confidence in the viability of the transaction from a direct representation in the share purchase agreement that the MidCoast entities that would be purchasing AC had a net worth of $10 million, a provision for which the Altermans had to negotiate.

There was a lot of back and forth between the AC shareholders' attorneys and MidCoast's counsel. One of the areas that MidCoast was investigating was AC's potential environmental liabilities. After the AC shareholders signed a final letter of intent dated October 14, 2003, MidCoast through its counsel at Akerman Senterfitt did extensive due diligence on AC. Mr. Barron coordinated with AC to provide the information that MidCoast requested. Mr. Barron testified that the AC shareholder's attorneys were constantly communicating with MidCoast's lawyers to provide MidCoast with additional information that it had requested. MidCoast's due diligence period was extended twice.

The final share purchase agreement included the following promises by MidCoast:

- MidCoast would not allow AC to be dissolved or liquidated for at least four years and had no intention of allowing that after four years either.

[*18] - MidCoast would reengineer AC into an asset recovery business.

- MidCoast would ensure that AC invested at least $1,450,000 into delinquent receivables and would reinvest the proceeds into more delinquent receivables for the next 10 years.

- MidCoast would ensure that AC maintained a net worth of at least $1.5 million for at least four years.

- MidCoast would "cause * * * [AC] to pay the Deferred Tax Liability to the extent that the Deferred Tax Liability is due given the Company's post-closing business activities and shall file all federal and state income tax returns on a timely basis related thereto."

- MidCoast would indemnify the former shareholders against any and all claims, including any damages, losses, deficiencies, liabilities, costs, and expenses resulting from and relating to any "misrepresentation, breach of warranty or nonfulfillment of any agreement or covenant on the part of any Purchaser under this Agreement".

- MidCoast would represent that the "combined net worth of Purchasers exceeds $10,000,000 as of the date hereof and as of the Closing Date."

The share purchase agreement also incorporated by reference an escrow agreement that controlled the flow of funds and gave specific instructions to the escrow agent.

The Altermans' advisers were not asked to write a formal tax opinion, but their tax attorney, Mr. Jovanovich, said that "we didn't feel that [a] tax opinion

[*19] would have been of value * * * [b]ecause the opinion would have had reps, representations, factual assumptions, and again we would have been relying on the same assumptions that we put into the purchase agreement." Indeed, the Commissioner's own expert agreed that an "opinion writer in this circumstance would have to assume all of those representations contained in the Share Purchase Agreement were true".

Richard Alterman testified that he relied on his attorneys to evaluate the MidCoast deal and requested that they advise him on the transaction's validity. He explained that he understood "due diligence" to mean that "you look at the details of the transaction and * * * determine whether you want to go forward." He relied on his attorneys to do this.

IV.    Redemption Transaction

Before the AC shareholders signed the share purchase agreement with MidCoast, MidCoast required that AC spin off all the assets and liabilities that MidCoast did not want for purposes of its new asset recovery business. AC formed and was the 100% owner of Alterman Enterprises, LLC, which filed its articles of organization on October 23, 2003. Alterman Enterprises then formed six wholly owned subsidiary LLCs. Between October 27 and November 5, 2003,

[*20] AC transferred its trucking terminals and associated liabilities to Alterman Enterprises.

As part of the partial redemption AC transferred the $12,502,994 note receivable, which represented the money borrowed to pay Mr. Alterman, Sr.'s estate tax, to Alterman Enterprises. After the redemption Alterman Enterprises had $27,463,444 of equity, which included the $12,502,994 note receivable, and AC had sufficient funds remaining to cover its liabilities (including the putative tax liabilities) with net equity of $1,501,336. The redemption did not render AC insolvent, a fact acknowledged by the Commissioner's expert.

On November 12, 2003, AC then distributed the Alterman Enterprises stock to its shareholders in exchange for part of their AC stock. This represented a partial redemption of the AC shares. Specifically, AC redeemed 454,644 shares of AC stock, leaving 24,854 remaining AC shares outstanding. The value per share was approximately $60.41. After the redemption the AC shareholders held interests in Alterman Enterprises in the same proportion as their interests in AC.[12]

---

[12]Specifically, the ownership percentages of both AC and Alterman Enterprises were:

| Shareholder | Ownership of shares outstanding (percent) |
| --- | --- |
| Sidney Alterman Irrevocable Trust | 78.1692 |

(continued...)

[*21] In late 2002 AC entered into an agreement to sell its name "Alterman", its logo, and its Florida customer list to Colorado Boxed Beef Co.

## V.    Sale of AC Stock to MidCoast

MidCoast through its two domestic subsidiaries, MidCoast Acquisitions Corp. (MAC) and MidCoast Credit Corp. (MCC) (collectively MidCoast acquisition vehicles), purchased 100% of the outstanding shares of AC stock. MAC purchased 25% and MCC purchased 75% of the AC stock.  The consummation of the purchase was controlled by the share purchase agreement, described previously.  The parties used Morris, Manning & Martin as the escrow agent for the sale, which Mr. Barron considered to be reputable because he had previously closed a transaction where Morris, Manning & Martin had served as escrow agent.  The MidCoast acquisition vehicles borrowed $5,080,000 from Sequoia Capital, LLC, to fund the $5,059,331 purchase price.[13]  Under the terms

---

[12](...continued)

| Sidney Alterman | 10.2207 |
| John Alterman | 3.8303 |
| Richard Alterman Revocable Trust | 3.8578 |
| Bryan Alterman Revocable Trust | 3.8757 |
| John Alterman Trust U/A/D 12/27/95 | 0.0463 |

[13]MAC borrowed $1,270,000 and MCC borrowed $3,810,000.  MAC agreed to repay $1,276,350 and MCC agreed to repay $3,829,050 to Sequoia.  We find

(continued...)

[*22] of the loan agreements, MAC and MCC had to repay $5,105,400 collectively on demand, with the difference representing implied interest on the loan.[14]

The escrow agreement required the separation of funds. First, Sequoia, as lender to the MidCoast acquisition vehicles, had to deposit the purchase price into Morris, Manning & Martin's Interest on Lawyers Trust Account (IOLTA). Next, AC had to deposit its cash into the IOLTA. The escrow agreement provided that at all times the AC funds would remain AC's exclusive property. After those deposits, Morris, Manning & Martin would pay out the purchase price to the AC shareholders. Finally, Morris, Manning & Martin would credit the AC funds back to a new AC bank account in the exact amount that AC had deposited into the IOLTA. All these steps were contingent on the buyer's and seller's following through with the agreement, and Morris, Manning & Martin was instructed to stop the execution of the escrow agreement if one or both parties failed to abide by the terms of the agreement.

---

[13](...continued)
that the difference between the amounts advanced and the amounts that MAC and MCC agreed to repay represents implied interest.

[14]These loans from Sequoia to the MidCoast acquisition vehicles were satisfied the same day that they were entered into by the proceeds of the sale of the AC shares to Sequoia.

[*23] The sale of AC by the Alterman shareholders to the MidCoast acquisition vehicles on December 5, 2003, had the following steps:

1. Sequoia, as lender, deposited $5,080,000 into the escrow account of Morris, Manning & Martin at Wachovia Bank, which was an IOLTA.

2. AC deposited its $6,455,772.50 cash into the escrow account.

3. Morris, Manning & Martin sent $5,059,331 total to the Alterman shareholders, representing the purchase price paid by MidCoast, plus reimbursement for professional fees, and less a $20,000 holdback pending the outcome of a Florida State intangible property tax exam.

4. Morris, Manning & Martin sent $5,167.25 to MAC.

5. Morris, Manning & Martin sent $15,501.75 to MCC.

6. Morris, Manning & Martin sent $6,455,772.50 to AC at its Deutsche Bank account.

The escrow agreement had wire instructions for specific accounts for the former Alterman shareholders but not specific account information for AC's funds; however, the escrow agreement specified that AC would instruct Morris, Manning & Martin where to send the funds.[15] AC instructed the funds to be sent

---

[15]The escrow agreement directed the "Escrow Agent to make the following disbursements: * * * (ii) after, but not before, the occurrence of the Purchase Price Delivery Time, to deliver the Alterman Escrow Funds to Alterman and to disburse Alterman Escrow Funds as Alterman shall direct (the parties acknowledging that, at such time, Alterman shall be owned and controlled by the

(continued...)

**[\*24]** to its new bank account at Deutsche Bank, and the funds were sent that day, December 5, 2003.

At the time of the sale of the AC stock to MidCoast, AC had assets of $6,455,772.50 in cash and $1,330,321 in prepaid taxes and an expected tax liability for 2003 of $6,284,675, resulting in net equity of $1,501,418.50.[16] During the sale on December 5, 2003, AC's cash was held in Morris, Manning & Martin's IOLTA as required under the escrow agreement. After the sale, that cash was transferred to AC's account at Deutsche Bank. Accordingly, AC again had assets of $6,455,772.50 in cash and $1,330,321 in prepaid taxes and an expected tax liability for 2003 of $6,284,675, resulting in the same net equity of $1,501,418.50 after the transaction on December 5, 2003.

---

[15](...continued)
Buyers)."

[16]$6,455,772.50 + $1,330,321 - $6,284,675 = $1,501,418.50. This net equity reflects an additional $82.50 of equity over the amount existing on November 12, 2003.

**[*25]** VI.    <u>Sequoia's Immediate Purchase of AC Stock Without Former Shareholders' Knowledge</u>

Unbeknownst to the Altermans or their advisers, MidCoast and Sequoia had an agreement for Sequoia to immediately purchase the AC shares from the MidCoast acquisition vehicles.  MidCoast and its representatives had always maintained that MidCoast planned to reengineer AC into an asset recovery business, and it made significant promises to this effect in the share purchase agreement.  Indeed, MidCoast's own representative that the Commissioner called as a witness at trial, Mr. Wellington, testified:

> QUESTION:  In any of the meetings that you attended with Mr. Alterman and/or any of his representatives, any of them, was it communicated to anyone on the Alterman side of the table, that MidCoast intended to immediately resell the Alterman Corporation as soon as it closed on the acquisition of that corporation?

> MR. WELLINGTON:  To the contrary.

> QUESTION:  To the contrary? What do you mean by to the contrary?

> MR. WELLINGTON:  It was expressed that it was being acquired to be reengineered into the credit card deduction business, that asset recovery business.

MidCoast represented to the Altermans and their advisers that the tax liability "was to be offset through the use of certain high basis, low market value assets, including the purchase and collection of credit card receivables."  As Mr.

[*26] Wellington candidly testified, MidCoast misled the Altermans, their attorneys at Berger Singerman, and their C.P.A. Mr. Lefcourt.

Further, the Commissioner's own expert testified that neither the Altermans nor their attorneys had any way of knowing that MidCoast would sell the stock to Sequoia or that MidCoast had lied to them. That this scheme was not reasonably discoverable by the Altermans was further confirmed by IRS Revenue Agent Anne Tinkell, who later investigated MidCoast for promoter penalties. She testified that she tried to uncover fraud by MidCoast and kept asking questions of MidCoast during her four-year investigation. Ultimately, after being repeatedly told that MidCoast was in the business of reengineering target corporations into asset recovery businesses and after doing research on MidCoast that indicated it was one of the 25 largest debt collection agencies in the country, she concluded: "I was unable to uncover any evidence of false and fraudulent statements [by MidCoast]. It doesn't mean that it wasn't there; I just was unable to get my hands on it."

Neither the Alterman brothers nor their advisers knew about MidCoast's immediate sale of the AC stock to Sequoia until the IRS subpoenaed them years later in 2006. When Mr. Barron finally discovered that MidCoast had not caused AC to pay its 2003 tax liability, he was "shocked and stunned".

[*27] Mr. Jovanovich nearly "fell off * * * [his] chair" when he heard the news. Mr. Jovanovich testified that the immediate purchase by Sequoia was something with which he "would never associate myself or allow clients to associate themselves with." As noted by Mr. Barron, Sequoia's immediate purchase of AC was "completely opposite of what we were told." MidCoast concealed its intended sale of the AC shares to Sequoia from the Altermans and their advisers, and MidCoast's intent was not reasonably discoverable by the Altermans or their advisers.

After Sequoia took over AC it contributed $10.5 million to AC's Deutsche Bank account on December 8, 2003. After this transfer, AC had assets of $16,955,772.50 in cash and $1,330,321 in prepaid taxes, and it had $6,284,675 in deferred tax liabilities, resulting in a net balance of $12,001,418.50.

AC then sent $16,780,000 to an account in the name of Delta Trading Partners, LLC, in the Cook Islands on December 9, 2003. Neither party offered evidence about who owns this account or who holds an interest in Delta Trading Partners or where the money went after this point. AC further sent $169,679 to MCC on December 10, 2003.

On February 3, 2004, MCC and MAC paid Alterman Enterprises the $20,000 held back under the share purchase agreement after they were informed

[*28] by Mr. Barron that AC's State intangible property tax exam had resulted in a ruling that AC had overpaid its tax.

In March 2004 AC filed a Form 4466, Corporation Application for Quick Refund of Overpayment of Estimated Tax, requesting a refund of $1,329,848. The IRS issued a refund check to AC for this amount, and AC deposited $1,329,848 into its Deutsche Bank account in April 2004. On May 17, 2004, AC transferred $1,329,848 from its Deutsche Bank account to MCC's Suntrust Bank account. The transfer indicated that it was for the benefit of AC.

AC also filed a Form 7004, Application for Automatic Extension of Time To File Corporation Income Tax Return, in March 2004. On July 20, 2004, AC filed its Form 1120, U.S. Corporation Income Tax Return, for the tax year ending December 31, 2003, stating that it owed no tax. AC claimed a deduction for losses from interest rate swap option sales, which offset the deferred gain that MidCoast had promised to pay under the share purchase agreement of $6,284,675 in deferred taxes.

AC filed returns for 2004 and 2005. The IRS received AC's Form 1120 for the 2004 tax year on March 27, 2005. This form showed interest income of $391. The Deutsche Bank statement for the account in AC's name for June 2004 shows

[*29] year-to-date "Dividends/Interest" of $391.33. On March 6, 2006, the IRS received AC's Form 1120 for the 2005 tax year.

AC changed its name to Enterprises of Miami and administratively dissolved in September 2005 because it did not file its annual report.

VII. Audit

The IRS audited AC's 2003 Form 1120 return and disallowed the loss deduction. The examination began in 2005. The IRS issued a notice of deficiency to AC on July 18, 2007, determining a deficiency of tax of $5,230,234 and an accuracy-related penalty under section 6662(h)[17] of $2,092,094. AC did not file a petition to challenge the notice.

The IRS took minimal steps to try to collect the 2003 tax liability from AC or to pursue related entities after it assessed the tax in December 2007. Revenue Officer Ted Hanson was assigned to the case originally in May 2006. Officer Hanson first made transferee liability recommendations before further investigating AC. He said: "The purpose of this investigation is to determine if there is collection potential from Alterman Corporation should a transferee assessment under IRC 6901 be recommended against it." It is unclear what

---

[17]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[*30] Officer Hanson investigated, but he said he could not determine whether there were any assets remaining in AC. Remarkably, according to the record before us, nothing was done for over a year.

The next revenue officer to do substantive research on the case was Ann Taylor, who began to work the case on May 12, 2008; but she did not vigorously pursue leads to find AC assets. Officer Taylor determined early in her investigation that AC had changed its name to Enterprises of Miami. Officer Taylor testified that she did not pursue any leads that were given to her about people she had identified that were connected with Enterprises of Miami but focused exclusively on AC. Officer Taylor did not use the bank account information that she received to attempt to trace funds that appeared to have been wired offshore. Officer Taylor then declared in her final report dated March 16, 2009, that AC's 2003 tax liability was uncollectible.

On December 22, 2009, the IRS asserted AC's putative tax liability against the three petitioner trusts as transferees of transferees under section 6901. The notices of liability were sent to the Bryan S. Alterman Trust U/A/D May 9, 2000, the Richard C. Alterman Trust U/A/D May 9, 2000, and the John M. Alterman Trust U/A/D May 9, 2000, and in those notices the IRS determined that each of the recipients was liable as a transferee of Mr. Alterman, Sr.'s estate and the Sidney

[*31] Alterman Irrevocable Trust, who were initially transferees of AC for the entire amount of its deficiency of $5,230,234 and accuracy-related penalty of $2,092,094 for 2003, plus statutory interest.

The IRS further issued a related notice of liability on June 16, 2011, to petitioner John Alterman determining he was liable as an initial transferee of AC for $1,243,024 of the deficiency and accuracy-related penalty, plus interest.

VIII.  Former AC Shareholders Prevail Against MidCoast for Breach of Contract and Fraud

Neither the Altermans nor their advisers learned of MidCoast's fraud until after the IRS began auditing AC's 2003 Form 1120.  As part of that examination, the Altermans received information document requests from the IRS in May 2006.  Mr. Barron wrote to MidCoast on behalf of the former shareholders in late May 2006 requesting that it honor the share purchase agreement and pay costs associated with the IRS' requests for information.

The Altermans later filed suit in February 2010 against MidCoast, Michael Bernstein, and Donald Stevenson for breach of contract, fraud in the inducement, and conspiracy to commit fraud.[18]

---

[18]Alterman v. MDC Credit Corp., No. 10-09439 CA 04 (Fla. Cir. Ct. final judgment entered Apr. 19, 2012).  Mr. Stevenson gave a deposition in this case and reached a settlement with the Altermans.  The Commissioner filed a motion in
(continued...)

[*32] A Florida State court found in favor of the Altermans and awarded them a judgment on April 19, 2012, against MidCoast for approximately $683,000 for the amounts that the Altermans had already spent in responding to the IRS inquiries and claims. Further, the court held that MidCoast had to indemnify the former shareholders against further IRS liability as a result of AC's 2003 tax liability.

In 2011 Mr. Stevenson testified in Griffin v. Commissioner,[19] a case involving another stock sale to MidCoast. In part of his testimony Mr. Stevenson described MidCoast's routine practice and profiles of typical target corporations it sought to acquire, MidCoast's practice of purchasing and reengineering the targets into asset recovery businesses that purchased receivables, and how this method was used to defer tax. He further explained MidCoast's general practice of using a formula for the purchase price of the target's assets less a percentage of its tax liability. Mr. Stevenson also testified that his role for MidCoast was to identify potential target corporations and to relay information about MidCoast to those

---

[18](...continued)
limine to exclude Mr. Stevenson's deposition testimony; however, petitioners seek to have his deposition admitted as evidence in these proceedings. We declined to rule on this motion at trial.

[19]T.C. Memo. 2011-61. Petitioners seek to have this testimony admitted as well, but the Commissioner filed a motion in limine to exclude it. We declined to rule on this motion at trial.

[*33] potential targets; however, he typically did not have any further contact with the former shareholders of the target corporations MidCoast purchased after he sent them a letter of intent.

## IX. MidCoast Principals Indicted

In 2012 the U.S. Government indicted many of the MidCoast principals in United States v. Veera.[20] The Government brought charges against Mr. Stevenson, among others, and alleged in its indictment that MidCoast's acquisition staff "was misleading the target corporations' shareholders and their representatives about how MidCoast Financial would use the corporations after they were purchased."[21] Indeed, the Government further alleged that MidCoast

> concealed MidCoast Financial's actual business model, in particular, of buying and immediately re-selling target corporations from its acquisition staff so that the target corporations' income taxes could be evaded. This concealment necessarily caused the MidCoast Financial acquisition staff to describe MidCoast Financial's business model

---

[20]United States v. Veera, No. 12-444 (E.D. Pa. Oct. 1, 2013) (superseding indictment). In addition, there were criminal informations filed in United States v. Ahn, No. 12-319 (E.D. Pa. filed June 26, 2012), and United States v. Del Bove, No. 13-422 (E.D. Pa. filed Aug. 22, 2013). Both Mr. Ahn and Ms. Del Bove were involved with MidCoast at the time that the Altermans sold their stock in AC to MidCoast.

[21]Veera, No. 12-444, slip op. at 8.

[*34] falsely to potential selling shareholders of target corporations and their representatives.[22]

X.     Trial

Petitioners timely petitioned the Court in response to their respective notices of liability.

The three petitioner trusts were created from the Sidney Alterman Irrevocable Trust that was governed by Florida law as well as from Mr. Alterman, Sr.'s will that was probated in Florida. The mailing address of the John M. Alterman Trust U/A/D May 9, 2000 was in South Carolina when it petitioned. The mailing address of the Bryan S. Alterman Trust U/A/D May 9, 2000 was in Colorado when it petitioned. The mailing address of the Richard C. Alterman Trust U/A/D May 9, 2000 was in Florida when it petitioned.

John Alterman resided in Florida when he petitioned. Before trial John Alterman passed away after a long battle with Parkinson's disease, and a representative of his estate took over his proceeding.

The Court consolidated the cases at docket nos. 6936-10, 6940-10, 7071-10, and 20636-11 for trial, briefing, and opinion. Trial was held in Chicago, Illinois.

---

[22]Veera, No. 12-444, slip op. at 14.

**[\*35]**                                        OPINION

We must decide whether petitioners are liable for AC's unpaid 2003 tax and penalties under Florida's Uniform Fraudulent Transfer Act (FUFTA)[23] and whether the procedural requirements of section 6901 are met.  Specifically, we must determine whether the Estate of John Marks Alterman is liable as a transferee of AC and whether petitioners John M. Alterman Trust U/A/D May 9, 2000, Bryan Alterman Trust U/A/D May 9, 2000, and Richard Alterman Trust U/A/D May 9, 2000 are liable as transferees of the Sidney Alterman Irrevocable Trust and Mr. Alterman, Sr.'s estate, which were alleged transferees of AC.

The Commissioner determined that the redemption and stock sale should not be respected and should instead be treated as AC's liquidating and making a distribution to its shareholders.  The Commissioner asserts that the Court should treat these transactions as "a sale of the assets of Alterman Corporation followed by a distribution by Alterman Corporation of its proceeds to its shareholders."  Thus, overall the Commissioner determined that "[i]n substance, for all transactions (stock sale and redemption transaction), the shareholders received a distribution in liquidation from Alterman Corporation."  Petitioners argue that the Commissioner's determinations were in error because the Commissioner cannot

------

[23]Fla. Stat. Ann. secs. 726.101-726.112 (West 2012).

**[\*36]** prove that petitioners received fraudulent transfers under FUFTA and because the Commissioner has not satisfied the procedural requirements under section 6901 to pursue petitioners as transferees.

Before deciding the multifaceted transferee liability issues, however, there are outstanding evidentiary issues we must address.

## I.  Admissibility of Mr. Stevenson's Deposition and Testimony

The parties presented several evidentiary issues at trial, and we reserved ruling on the admissibility of Mr. Stevenson's testimony in Griffin and his deposition in Alterman v. MDC Credit Corp.  Petitioners argue that both should be admissible under rules 804(b)(1) and (3) and 807 of the Federal Rules of Evidence.  The Commissioner disagrees and argues that neither Mr. Stevenson's testimony nor his deposition is admissible because neither satisfies the requirements set forth in the Federal Rules of Evidence.

### A.  Mr. Stevenson's Testimony in Griffin Is Partially Admissible Under Rule 804(b)(1) of the Federal Rules of Evidence.

Rule 804(b)(1) of the Federal Rules of Evidence allows statements of an unavailable declarant to be admitted if the declarant gave former testimony "as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and * * * is now offered against a party who had--

**[*37]** or, in a civil case, whose predecessor in interest had--an opportunity and similar motive to develop it by direct, cross-, or redirect examination."

Mr. Stevenson's prior testimony in <u>Griffin</u> meets the test under rule 804(b)(1) of the Federal Rules of Evidence. Mr. Stevenson is currently a criminal defendant in <u>Veera</u>, and the parties stipulated that if required to take the stand as a witness, Mr. Stevenson would assert his Fifth Amendment privilege and refuse to testify. Thus, he is unavailable.[24] Mr. Stevenson testified as a witness at the <u>Griffin</u> trial where the Commissioner had an opportunity and similar motive to develop his testimony. Therefore, we admit Mr. Stevenson's testimony in <u>Griffin</u> with certain caveats. Specifically, we admit those portions of Mr. Stevenson's testimony in <u>Griffin</u> that relate to his habit and to MidCoast's routine practices.[25]

B. <u>Mr. Stevenson's Deposition in MDC Credit Corp. Is Not Admissible Under Rule 804(b)(1) or (3), or 807 of the Federal Rules of Evidence.</u>

We decline to admit Mr. Stevenson's deposition in <u>MDC Credit Corp.</u> under rule 804(b)(1) of the Federal Rules of Evidence. The Commissioner was not a

---

[24]<u>See</u> Fed. R. Evid. 804(a).

[25]<u>See</u> Fed. R. Evid. 406 ("Evidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice. The court may admit this evidence regardless of whether it is corroborated or whether there was an eyewitness.").

**[\*38]** party in that case, and no predecessor to his interest with a similar motive to develop Mr. Stevenson's deposition was a party to it, either.  Accordingly, Mr. Stevenson's deposition is not admissible under rule 804(b)(1) of the Federal Rules of Evidence.

Rule 804(b)(3) of the Federal Rules of Evidence allows a statement against interest to be admitted if the declarant is unavailable as a witness.  As already discussed, Mr. Stevenson is unavailable.  To be a statement against interest, the statement must be one that "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability".[26]  The Supreme Court has explained that rule 804(b)(3) of the Federal Rules of Evidence allows only "self-inculpatory" statements to be admitted, but other statements that are collateral to the self-inculpatory statements and are not <u>themselves</u> self-inculpatory are not admissible under this rule.[27]  Indeed, rule 804(b)(3) of the Federal Rules of Evidence "does not allow admission of non-self-inculpatory statements, even if they are made

---

[26]Fed. R. Evid. 804(b)(3)(A).

[27]<u>Williamson v. United States</u>, 512 U.S. 594, 600-602 (1994).

**[*39]** within a broader narrative that is generally self-inculpatory."[28] Thus, we are required to evaluate admissibility under rule 804(b)(3) of the Federal Rules of Evidence on a statement-by-statement basis.

First, we decline to admit Mr. Stevenson's deposition in its entirety because rule 804(b)(3) of the Federal Rules of Evidence requires us to evaluate each statement separately to determine whether it is self-inculpatory, and the entire deposition as a whole does not meet this standard.

We further decline to admit any statements from Mr. Stevenson's deposition under rule 804(b)(3) of the Federal Rules of Evidence because his statements in his deposition do not have a "great * * * tendency to * * * expose * * * [him] to civil or criminal liability".[29] Two relevant statements that petitioners seek to admit from Mr. Stevenson's testimony are his testimony (as characterized by petitioners) that the "Altermans had no reason to know that MidCoast was going to immediately transfer the Alterman companies to a third party on the same day the Alterman companies were acquired." Petitioners further summarize a statement they seek to admit stating: "Stevenson was unaware that there was going to be a

---

[28]Williamson v. United States, 512 U.S. at 600-601; accord Pappas v. Commissioner, T.C. Memo. 2002-127, 2002 WL 1035454, at *18.

[29]Fed. R. Evid. 804(b)(3).

[*40] wholesale transfer of the Alterman companies to a third party on the same day that Alterman companies were acquired." Neither of these statements exposes Mr. Stevenson to civil or criminal liability. Indeed, these are statements in which Mr. Stevenson was distancing himself from the misconduct of others. Accordingly, we decline to admit the deposition for failure to meet that requirement of rule 804(b)(3) of the Federal Rules of Evidence.

Petitioners further argue that Mr. Stevenson's deposition is admissible under the residual, catchall exception found in rule 807 of the Federal Rules of Evidence. The residual hearsay exception requires that

> (1) the statement * * * [have] equivalent circumstantial guarantees of trustworthiness;

> (2) * * * [be] offered as evidence of a material fact;

> (3) * * * [be] more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and

> (4) admitting it will best serve the purposes of these rules and the interests of justice.[30]

Mr. Stevenson's deposition does not satisfy the four requirements under rule 807 of the Federal Rules of Evidence. First, we do not have sufficient guaranties of trustworthiness because we do not know when Mr. Stevenson settled his

---

[30]Fed. R. Evid. 807(a)(1)-(4).

**[\*41]** dispute with the Altermans in relation to the time he gave this deposition. We also do not know whether Mr. Stevenson's interests were adverse to or aligned with MidCoast's at the time he gave this deposition. Next, even assuming that the evidence is of a material fact and is more probative than other evidence, we have duplicative evidence on these material facts elsewhere in the record. Finally, on the issue of whether admitting this deposition would best serve the purposes of these rules one of the factors that weighs heavily, while certainly not dispositive, is the fact that the Commissioner was not represented during the deposition. Accordingly, petitioners have not satisfied the four requirements under rule 807 of the Federal Rules of Evidence, and thus we will not admit Mr. Stevenson's deposition testimony.

II.    Section 6901 Transferee Liability Overview

Congress enacted section 6901 in 1926 as a procedural tool to allow the IRS to proceed against transferees in the same way that it could proceed against other taxpayers under the Code.[31] The Commissioner can pursue both initial transferees and successive transferees under section 6901.[32]

---

[31]Starnes v. Commissioner, 680 F.3d at 425-426.

[32]Sec. 6901(a), (c).

**[*42]** A.   <u>The Commissioner Must Prove Two Separate and Independent</u>
<u>Conditions</u>.

The Commissioner has the burden to prove that petitioners are liable as

transferees, but he does not shoulder that burden for the underlying liability of the

taxpayer.[33]  Specifically, the Commissioner must prove two separate and

independent conditions:  (1) that petitioners are "transferees" as defined under

section 6901 and (2) that an "independent basis * * * exist[s] under applicable

State law or State equity principles for holding the * * * [transferees] liable for the

taxpayer's unpaid tax."[34]  The Commissioner has this burden because the

"Government's substantive rights * * * are precisely those which other creditors

would have under [State] law", and accordingly, the Commissioner must show that

an independent basis exists under State law or State equity to hold transferees

liable for the putative tax.[35]

---

[33]<u>See</u> sec. 6902(a); Rule 142(d).  Because petitioners have not argued that
AC does not owe the underlying 2003 tax liability, the only issue for us to decide
is whether petitioners are liable as transferees.

[34]<u>See</u> <u>Swords Trust v. Commissioner</u>, 142 T.C. 317, 336 (2014).

[35]<u>See</u> <u>Commissioner v. Stern</u>, 357 U.S. 39, 47 (1958); <u>see also</u> <u>Diebold</u>
<u>Found., Inc. v. Commissioner</u>, 736 F.3d at 185.

**[\*43]** B.  The Commissioner Cannot Recast Using Federal Law When Evaluating State Law Substantive Liability.

It is well established that the Commissioner cannot recast transactions under Federal law and then apply State law to the transactions as recast under Federal law.  Indeed, "Stern forecloses the Commissioner's efforts to recast transactions under federal law before applying state law to a particular set of transactions."[36] The Commissioner continues to argue this theory despite its being rejected twice in Division Opinions of our Court[37] and by the U.S. Courts of Appeals for the First,[38] Second,[39] Fourth,[40] Seventh,[41] and Ninth Circuits.[42]

The Supreme Court, citing Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938), concluded that the two conditions were independent inquiries:  "[U]ntil Congress

---

[36]Swords Trust v. Commissioner, 142 T.C. at 339 (quoting Starnes v. Commissioner, 680 F.3d at 429); see also Diebold Found., Inc. v. Commissioner, 736 F.3d at 185-186; Frank Sawyer Trust of May 1992 v. Commissioner, 712 F.3d at 604-605; Stuart v. Commissioner, 144 T.C. 235, 253-256 (2015).

[37]Stuart v. Commissioner, 144 T.C. at 353-356; Swords Trust v. Commissioner, 142 T.C. at 338-340.

[38]Frank Sawyer Trust of May 1992 v. Commissioner, 712 F.3d at 604-605.

[39]Diebold Found., Inc. v. Commissioner, 736 F.3d at 184-185.

[40]Starnes v. Commissioner, 680 F.3d at 428-429.

[41]Feldman v. Commissioner, 779 F.3d at 458.

[42]Salus Mundi Found. v. Commissioner, 776 F.3d at 1012, 1018-1019.

**[\*44]** speaks to the contrary, the existence and extent of liability should be determined by state law"--specifically the State where the transfer was made.[43] The Supreme Court further determined that "Congress has not seen fit to define that liability and that none exists except such as is imposed by state law."[44] Therefore, the Government cannot be put in a better position than other creditors and cannot use Federal law to collapse the transaction under State law.[45] Accordingly, we decline to do so here.

III.    Procedural Requirements of Section 6901

The Commissioner has the burden to prove that there was a transfer and that petitioners are transferees under section 6901. "Transferee" is nonexclusively defined and includes a "donee, heir, legatee, devisee, and distributee"[46] as well as a "shareholder of a dissolved corporation, the assignee or donee of an insolvent person, the successor of a corporation, a party to a reorganization as defined in

---

[43]Commissioner v. Stern, 357 U.S. at 45; see also Starnes v. Commissioner, 680 F.3d at 426.

[44]Commissioner v. Stern, 357 U.S. at 47.

[45]Commissioner v. Stern, 357 U.S. at 47; see Diebold Found., Inc. v. Commissioner, 736 F.3d at 186.

[46]Sec. 6901(h).

**[*45]** section 368, and all other classes of distributees."[47]  Further, we have recently held that "[a] person can be a transferee within the meaning of the section if he is an indirect transferee of property";[48] "is a constructive recipient of property";[49] or "merely benefits in a substantial way from a transfer of property".[50] "The determinative factor is liability to a creditor (the Commissioner) for the debt of another under a State fraudulent conveyance, transfer, or similar law."[51]

Because of these expansive definitions of both "transfer" and "transferee" under section 6901, we conclude that the Commissioner has shown at least an indirect transfer and that petitioners were transferees under the procedural requirements of section 6901.[52]

---

[47]Sec. 301.6901-1(b), Proced. & Admin. Regs.

[48]Stuart v. Commissioner, 144 T.C. at 272 (citing Stanko v. Commissioner, 209 F.3d 1082 (8th Cir. 2000), rev'g T.C. Memo. 1996-530).

[49]Stuart v. Commissioner, 144 T.C. at 272 (citing Shartle v. Commissioner, T.C. Memo. 1988-354).

[50]Stuart v. Commissioner, 144 T.C. at 272 (citing Cole v. Commissioner, T.C. Memo. 1960-278, rev'd on other grounds, 297 F.2d 174 (8th Cir. 1961)).

[51]Stuart v. Commissioner, 144 T.C. at 272.

[52]Although petitioners argue that procedurally Gumm v. Commissioner, 93 T.C. 475, 480 (1989), aff'd, 933 F.2d 1014 (9th Cir. 1991), lays out elements that the Commissioner must prove, that case serves to merely give an overview of the general law in this area and "certain of the elements described in Gumm frequently
(continued...)

**[\*46]** IV.   Liability Under State Law or State Equitable Principles

The Commissioner argues that under FUFTA petitioners are liable according to:  (1) an actual fraud theory;[53] (2) constructive fraud theories;[54] (3) a theory that petitioners were persons for whose benefit transfers were made;[55] and (4) a transferee of a transferee theory.[56]  He is wrong under each.  But before we take each State law liability theory in turn, the Commissioner argues that under a State common law doctrine of substance over form we should collapse the transactions.

---

[52](...continued)
are unnecessary under State law" and "section 6901 does not itself impose those requirements."  Hagaman v. Commissioner, 100 T.C. 180, 184 (1993).  Further, there is no requirement under FUFTA that the Commissioner make reasonable collection efforts against the transferor.  See Kardash v. Commissioner, T.C. Memo. 2015-51, at \*22-\*24 n.6, supplemented by T.C. Memo. 2015-197.  "Transferee liability is several."  Alexander v. Commissioner, 61 T.C. 278, 295 (1973).

[53]See Fla. Stat. Ann. sec. 726.105(1)(a).

[54]See Fla. Stat. Ann. secs. 726.105(1)(b), 726.106(1).

[55]See Fla. Stat. Ann. sec. 726.109(2).

[56]See, e.g., Frank Sawyer Trust of May 1992 v. Commissioner, 712 F.3d at 599-600.

**[*47]** A.     The Form of a Transaction Should Be Respected.

The Commissioner argues that we should collapse the transactions under Florida law.  In support of this analysis, the Commissioner cites a case from a Florida bankruptcy court which explained that some "courts have 'collapsed' transactions in order to evaluate an allegedly fraudulent conveyance in context to arrive at the substance of the transaction."[57]  One of the cases relied on by the bankruptcy court illuminates this process:  "In reality, collapsing transactions is little more than an effort on the part of the court to focus not on the formal structure of a transaction, but rather on the knowledge or intent of the parties involved in the transaction."[58]  Indeed, the bankruptcy court explained that

> [a]lthough the Court is unaware of any Eleventh Circuit case formally acknowledging the propriety of collapsing transactions to determine their economic reality, the Eleventh Circuit has stated that consistent with equitable concepts underlying bankruptcy law, the court must "look beyond the particular transfers in question to the entire circumstance of the transactions" in determining whether the debtor possessed property recoverable in a fraudulent transfer action. ✳ ✳ ✳ [59]

---

[57]Dilworth v. Ginn (In re Ginn-La St. Lucie Ltd.), 2010 Bankr. LEXIS 6324, at *24 (Bankr. S.D. Fla. Dec. 10, 2010) (relying on cases from the Courts of Appeals for the Second, Third, and Seventh Circuits.

[58]In re Best Prods. Co., 157 B.R. 222, 229 (Bankr. S.D.N.Y. 1993).

[59]Dilworth, 2010 Bankr. LEXIS 6324, at *25 (quoting In re Chase &

(continued...)

**[\*48]** Because Florida does not have a specific test that courts must use when applying the equitable doctrine of substance over form, we are instructed by other cases that have explained the proper evaluation.[60] In Starnes, we explained that in order to "render the initial transferee's exchange with a debtor fraudulent, that transferee must have had either actual or constructive knowledge of the entire scheme."[61] Indeed, "courts generally review whether all of the parties involved had knowledge of the multiple transactions."[62] Accordingly, we review whether the Altermans had actual or constructive knowledge.

          1.      The AC Shareholders Lacked Actual Knowledge.

The Altermans and their advisers did not have actual knowledge that MidCoast would fail to do what it promised under the share purchase agreement

---

[59](...continued)
Sanborn Corp., 848 F.2d 1196, 1199 (11th Cir. 1988)).

[60]See Flintkote Co. v. Dravo Corp., 678 F.2d 942, 945 (11th Cir. 1982) ("Only where no state court has decided the point in issue may a federal court make an educated guess as to how that state's supreme court could rule." (quoting Benante v. Allstate Ins. Co., 477 F.2d 553, 554 (5th Cir. 1973))).

[61]Starnes v. Commissioner, T.C. Memo. 2011-63, slip op. at 24.

[62]Starnes v. Commissioner, T.C. Memo. 2011-63, slip op. at 24; see also Feldman v. Commissioner, T.C. Memo. 2011-297, slip op. at 43 ("In Starnes, Griffin, and Frank Sawyer Trust, the facts as found did not establish that the taxpayers knew that MidCoast intended not to pay the taxes."). Frank Sawyer Trust was later reversed, but not on these grounds.

[*49] and immediately sell the AC shares. The Commissioner does not even argue that they had actual knowledge. MidCoast concealed from the Altermans and their advisers its plan to immediately sell the AC stock. Indeed, one of the MidCoast representatives, Mr. Wellington, testified that MidCoast never told the Altermans that MidCoast intended to immediately resell AC. He admitted that MidCoast misled the Altermans and their advisers. This is further supported by the fact that the Commissioner's own expert at trial testified that after reviewing the evidence, he believed that neither the Altermans nor their attorneys had any way of knowing that MidCoast was lying to them and that MidCoast was going to immediately sell the stock of AC to Sequoia. This is further supported by another of the Commissioner's witnesses, the IRS revenue agent who confirmed that MidCoast's plan was not reasonably discoverable. In describing her MidCoast investigation, she stated: "I was unable to uncover any evidence of false and fraudulent statements. It doesn't mean it wasn't there; I just was unable to get my hands on it." Finally, the Altermans' attorneys did not find out about what transpired until the IRS subpoenaed the Altermans years later in 2006. The attorneys each expressed surprise at what MidCoast had done.

**[*50]**     2.     <u>The AC Shareholders Lacked Constructive Knowledge</u>.

The Commissioner argues that petitioners had constructive knowledge that AC would be rendered insolvent and as a result petitioners should be held liable as transferees. He is wrong. In order to collapse the transactions under State law, the Commissioner must prove that the former AC shareholders had constructive knowledge that the MidCoast acquisition vehicles would cause AC to fail to pay its 2003 tax liability.[63] Constructive knowledge is either the "knowledge that ordinary diligence would have elicited" or a "more active avoidance of the truth".[64] In <u>Starnes</u>, the Court of Appeals for the Fourth Circuit Court explained there are two inquiries for constructive knowledge: (1) whether the former shareholders had a duty to inquire and (2) if so, what that inquiry would have

---

[63]<u>See</u> <u>Starnes v. Commissioner</u>, 680 F.3d at 433.

[64]<u>HBE Leasing Corp. v. Frank</u>, 48 F.3d 623, 636 (2d Cir. 1995) (quoting <u>United States v. Orozco-Prada</u>, 636 F. Supp. 1537, 1543 (S.D.N.Y. 1986), <u>aff'd</u>, 847 F.2d 836 (2d Cir. 1988)); <u>see also</u> <u>Diebold Found., Inc. v. Commissioner</u>, 736 F.3d at 187; <u>Kupetz v. Wolf</u>, 845 F.2d 842 (9th Cir. 1988).

We note that "[a]lthough <u>HBE Leasing Corp.</u> * * * and <u>Diebold</u> * * * are analyzed under the Uniform Fraudulent Conveyance Act (UFCA), the predecessor statute to UFTA, they are nonetheless instructive to our analysis because the collapsing of transactions is a common law doctrine" that would not have been changed by Florida's adoption of UFTA. <u>Cullifer v. Commissioner</u>, T.C. Memo. 2014-208, at *58 n.31.

[*51] revealed.[65] As to the former, the court asked whether "the Former Shareholders have actual knowledge of facts that would have led a reasonable person concerned about * * * [the transferor's] solvency to inquire further into MidCoast's post-closing plans".[66] If so, then the shareholders are on inquiry notice and had a duty to follow up. Next, the court analyzed whether "the inquiry a reasonably diligent, similarly-situated person would have undertaken revealed MidCoast's plan to leave * * * [the transferor] unable to pay its 2003 taxes".[67]

3. The Shareholders Fulfilled Their Duty To Inquire and Required Safeguards To Ensure the Tax Liability Was Paid.

The AC shareholders took reasonable steps to investigate the red flags they had initially discovered. The shareholders relied on their tax lawyers and financial advisers to determine whether MidCoast had proposed a sound purchase of their shares. MidCoast represented that it had been in the asset recovery business for many years and that it was "among the top 25 largest purchasers of delinquent consumer receivables in the United States." Mr. Polish was previously familiar with MidCoast. Mr. Morse contacted MidCoast references and got a good

---

[65]Starnes v. Commissioner, 680 F.3d at 434.

[66]Starnes v. Commissioner, 680 F.3d at 434.

[67]Starnes v. Commissioner, 680 F.3d at 434.

[*52] impression of MidCoast.  Mr. Barron drew confidence in MidCoast from the reputation of MidCoast's attorneys.  Likewise, Mr. Jovanovich was assured by the fact that the escrow agent was a reputable law firm.  The Altermans' advisers requested additional information about MidCoast's business plan, and they all believed that MidCoast's business plan to turn AC into an asset recovery business and defer AC's taxable gain through this business model was plausible.  Indeed, the Commissioner's own expert at trial admitted there are no standards for sell-side due diligence, only basic principles and accepted practices.[68]  A seller's main concern is whether the buyer will be able to close the deal.

The AC shareholders took reasonable steps to ensure that the MidCoast acquisition vehicles would honor their promises to pay the putative tax by placing significant covenants, representations, and warranties in the share purchase agreement.  The Altermans' advisers negotiated for specific provisions to be included in this contract, and the Altermans passed on another deal from Diversified because Diversified would not agree to those terms.  Among other promises the Altermans required from MidCoast, the share purchase agreement

[68]In explaining his report on sell-side due diligence the Commissioner's expert stated:  "There are generally accepted procedures, there are no standards out there for due diligence."  "[T]here is no board or body that sets out standards for due diligence.  However, the financial community, for which I've worked in for over 20 years, have basic principles for doing appropriate due diligence."

**[*53]** provided that: (1) MidCoast would cause AC to pay the putative tax liability; (2) MidCoast would cause AC to maintain a net worth of at least $1.5 million for at least four years (sufficient to pay the tax liability); (3) MidCoast represented that the combined net worth of the purchasers was greater than $10 million; (4) MidCoast would reengineer AC into an asset recovery business; (5) MidCoast would not allow AC to be dissolved or liquidated for at least four years and that it did not intend to do so thereafter; (6) MidCoast would cause AC to invest at least $1,450,000 in delinquent receivables and would reinvest the proceeds in more delinquent receivables for at least 10 years; and (7) MidCoast would indemnify the AC shareholders if MidCoast did not fulfill the terms of the share purchase agreement.

It was reasonable for the Alterman shareholders to rely on the covenants in the share purchase agreement. The MidCoast acquisition vehicles were not mere transitory entities.[69] Similarly, the MidCoast acquisition vehicles were domestic

---

[69]Cf. Diebold Found., Inc. v. Commissioner, 736 F.3d at 188 ("The Shareholder representatives plainly knew that Shap II [the intermediary] was a brand new entity that was created for the sole purpose of purchasing Double D [the target corporation's] stock."); Frank Sawyer Trust of May 1992 v. Commissioner, 712 F.3d at 600-601, 609 n.3 (acquisition company was formed to complete transactions); Tricarichi v. Commissioner, T.C. Memo. 2015-201, at *16, *24 (intermediary was shell company created for sole purpose of facilitating stock sale and merged into target corporation day after sale).

[*54] entities against whom the Alterman shareholders could take action to enforce the covenants.[70]

At trial the Commissioner's expert, Mr. Hastings, presented his conclusion that the Altermans did not do reasonable due diligence because they did not "investigate the technical merits" of MidCoast's plan to offset AC's upcoming tax liability and that the stock sale and the associated loan were not commercially reasonable. However, he admitted on cross-examination that it was "fair to say" that one of the steps the Altermans took, requesting representations and warranties from MidCoast, was a key part of sell-side due diligence in his opinion and that these representations went above and beyond what he has customarily seen. He also echoed other trial testimony and said that it appeared that MidCoast intended to defraud the Altermans from the beginning. Yet he opined that he believed the Altermans should have done more to follow up with MidCoast after the sale of their stock, such as getting postclosing financial statements and bank statements and putting more "teeth" in the covenants. Mr. Hastings stated that he had seen situations where the selling shareholders negotiated for the right to obtain

---

[70]Cf. Tricarichi v. Commissioner, at *16-*17 (intermediary had agreed to indemnify seller if putative tax liability went unpaid but was incorporated in Cayman Islands; seller's expert "admitted that 'there can be problems' enforcing warranties and covenants against offshore entities like Nob Hill [the intermediary] that have no assets in the United States").

**[*55]** postclosing financial statements from the corporation they had sold; however, he could not recall any specific examples or how many times he had encountered this.

Mr. Barron, who was also the Commissioner's witness and served as an attorney and adviser to the Altermans during the sale, testified that "[p]ost-closing monitoring is, is very rare in corporate transactions, it's not typical." This is so in part because a buyer will rarely agree to allow a seller to access its books or tax returns going forward.

The shareholders and their advisers performed adequate due diligence.

> 4. Further Inquiry Would Not Have Revealed That the Tax Liability Would Not Be Paid.

As we have already noted, the AC shareholders made a reasonable inquiry. Had they dug further, they would not have discovered that AC's tax liability would not be paid. The Court of Appeals for the Fourth Circuit in <u>Starnes</u> held that "if the Former Shareholders were on inquiry notice of MidCoast's plans and failed to make reasonably diligent inquiry, they are charged with the knowledge they would have acquired had they undertaken the reasonably diligent inquiry required by the known circumstances."[71] In <u>Starnes</u>, although the Tax Court found

---

[71]680 F.3d at 434.

[*56] that the former shareholders had a duty to make further inquiry that they failed to satisfy, the Court did not find that the former shareholders had constructive knowledge because it concluded that further "hypothetical effort would not likely have revealed MidCoast's post-closing plans to evade * * * [the transferor's] tax liability."[72]

In these cases MidCoast principals were later indicted for defrauding former target corporation shareholders. Even Mr. Wellington, who was part of the acquisition team, claimed that he did not know of the MidCoast acquisition vehicles' plan to immediately sell AC to Sequoia, which would then cause AC not to pay AC's tax liability.

The Government elsewhere has alleged that MidCoast's acquisition staff "was misleading the target corporations' shareholders and their representatives about how MidCoast Financial would use the corporations after they were purchased."[73] Indeed, the Government argued elsewhere that MidCoast "concealed MidCoast Financial's actual business model" and this "concealment

---

[72]Starnes v. Commissioner, 680 F.3d at 435-436 ("[T]he Tax Court clearly found that the Former Shareholders would not have learned through further inquiry so much more of MidCoast's intentions to justify the court's imposition of constructive knowledge.").

[73]Veera, No. 12-444, slip op. at 8.

[*57] necessarily caused the MidCoast Financial acquisition staff to describe MidCoast Financial's business model falsely to potential selling shareholders of target corporations and their representatives."[74]  And even the Commissioner's own revenue agent was unable to establish misrepresentations by MidCoast when she investigated MidCoast for promoter penalties.

     5.     It Was Not Unreasonable for the Altermans' Advisers To Believe MidCoast's Business Plan Was Viable.

The Commissioner argues that it did not make sense for MidCoast to purchase AC for a premium and this is another reason that the Altermans should have known that MidCoast would fail to pay the putative tax.  However, petitioners and their representatives were not unreasonable to believe that MidCoast had a viable business purpose to buy the stock of AC and convert AC into an asset recovery business.  Even accepting the Commissioner's argument that it would have been better for MidCoast to start a new entity than to acquire AC does not establish that it was unreasonable to use an existing entity.

The Altermans' advisers believed that MidCoast's business plan was feasible.  Mr. Barron generally understood that MidCoast was experienced in receivable collection and would use this business to defer AC's putative tax.  Mr.

---

[74]Veera, No. 12-444, slip op. at 14.

[*58] Jovanovich testified that he believed MidCoast's business plan to be "plausible" and described one applicable tax deferral method that had been available. Similarly, Mr. Polish thought MidCoast's tax deferral plan "sounded reasonable", in contrast to advising the Alterman shareholders to "walk away" from the Diversified deal.

We have previously "acknowledged that there are legitimate tax planning strategies involving built-in gains and losses and that it was not unreasonable, in the absence of contradictory information, for the representatives to believe that the buyer had a legitimate tax planning method."[75] Likewise, it was not unreasonable for the Altermans' advisers to believe that MidCoast had a legitimate tax deferral plan.

Accordingly, further inquiry by the Altermans or their advisers would have been futile, and it was not unreasonable for the Altermans and their advisers to believe MidCoast's business plan was viable.

6. The Transactions Should Be Respected Because There Was an Infusion of Cash, Not a Circular Flow of Funds.

The Commissioner argues that there was a circular flow of funds in the deal that served no purpose and that this is another reason that we should collapse the

---

[75]Swords Trust v. Commissioner, 142 T.C. at 349.

[*59] transactions. He states that the cash in AC was used to fund the purchase of the AC shares, but the facts do not support his argument. These cases closely resemble Starnes, where the Court of Appeals for the Fourth Circuit affirmed the Tax Court's holding that: (1) the target shareholders lacked constructive knowledge and (2) the target shareholders ultimately were not liable as transferees.[76] In Starnes, the shareholders of the target corporation, Tarcon, agreed to sell their stock to MidCoast, and MidCoast agreed to reengineer Tarcon into an asset recovery business and pay its tax liability. However, soon after acquiring Tarcon MidCoast sold the Tarcon stock and then Tarcon transferred its cash to an offshore account. Tarcon offset its tax liability with loss deductions that the IRS later disallowed. The IRS eventually pursued the former Tarcon shareholders for transferee liability. We held in that case that the Tarcon shareholders did not have any knowledge--actual or constructive--of MidCoast's plan to sell the shares and cause the Tarcon taxes not to be paid. Specifically, the Court of Appeals noted that the Tax Court had applied the correct standard for constructive knowledge under North Carolina law and that the "Commissioner was required to prove that no reasonably diligent person in the Former Shareholders' position would have

_____

[76]Starnes v. Commissioner, 680 F.3d at 417.

[*60] failed to discover that MidCoast would cause Tarcon to not pay its 2003 taxes."[77] The Court explained that "even though the Former Shareholders might have conducted further inquiry, such a hypothetical effort would not likely have revealed MidCoast's post-closing plans to evade Tarcon's tax liability."[78]

Because the shareholders in <u>Starnes</u> did not have constructive knowledge of MidCoast's plan to cause Tarcon to fail to pay its tax liability, we respected each of the separate steps of the transaction and did not collapse the transaction. Indeed, "[i]f all had gone as the Former Shareholders testified they thought it would, MidCoast would have continued operating Tarcon and in 2004 paid Tarcon's 2003 taxes."[79] In the absence of collapsing the steps, there was a clear infusion of cash by the purchaser MidCoast, and the shareholders were paid not with funds from the target corporation, Tarcon, but with MidCoast funds. The Court of Appeals for the Fourth Circuit stated: "As the Tax Court aptly put it:

---

[77]<u>Starnes v. Commissioner</u>, 680 F.3d at 434.

[78]<u>Starnes v. Commissioner</u>, 680 F.3d at 434.

[79]<u>Starnes v. Commissioner</u>, 680 F.3d at 424.

**[*61]** 'Thus, there was an infusion of cash into the transaction, not a circular flow of cash.'"[80]

Similarly in these cases, because the former AC shareholders did not have constructive knowledge of MidCoast's plan to sell its AC stock to Sequoia, we do not collapse the steps. Further, the separate steps of the transaction show that there was not a circular flow of funds. The purchase of the AC shares was funded by a loan from Sequoia to the MidCoast acquisition vehicles and not with AC funds. The AC funds were left untouched. Escrow records confirm that AC deposited $6,455,772.50 into the escrow account on December 5, 2003, and that the same $6,455,772.50 was wired to AC's new Deutsche Bank account before the close of business that same day. Under the escrow agreement and confirmed by escrow records, Sequoia deposited the money it lent to the MidCoast acquisition vehicles into the escrow, and per the escrow agreement the MidCoast acquisition vehicles then paid what were at that time MidCoast acquisition vehicles' funds to

---

[80]Starnes v. Commissioner, 680 F.3d at 424 n.5 (quoting T.C. Memo. 2011-63, slip op. at 20), 437 n.12.

[*62] the AC shareholders in exchange for their AC shares.[81] Accordingly, petitioners' sales of their AC stock to the MidCoast acquisition vehicles should be respected.

The Commissioner further argues that we should collapse the transactions because the loans from Sequoia to the MidCoast acquisition vehicles were shams. We disagree. First, the Commissioner's arguments about the loans by Sequoia are entirely inconsistent. The Commissioner argues that the loans by Sequoia were shams but at the same time argues that AC's guaranty of those loans left it insolvent. While the Commissioner may argue in the alternative, these inconsistencies reveal the weaknesses of both arguments. We respect these loans.[82] Under the loan agreements and promissory notes the MidCoast

---

[81]Of the $5,080,000 that Sequoia deposited as a loan to the MidCoast acquisition vehicles, $4,549,387 was sent to Alterman Enterprises, $509,944 was sent to Mr. Alterman, Sr.'s estate, and the remaining approximately $20,000 was paid to the MidCoast acquisition vehicles to account for the holdback in the share purchase agreement.

[82]Cf. Feldman v. Commissioner, 779 F.3d at 456 (affirming the Tax Court's finding that a loan to purchase the shares of the target corporation was a sham in part because "the loan was entirely undocumented; there was no promissory note or writing setting forth the terms of the loan"). Feldman is distinguishable from these cases because the Tax Court there found that "it is absolutely clear that all individuals involved * * * were aware that MidCoast and its representatives had no intention of ever paying the tax liabilities of * * * [the target corporation] and also that the source of the approximately $225,000 MidCoast premium to be

(continued...)

[*63] acquisition vehicles collectively borrowed $5,080,000 to fund the purchase of the AC shares, and they agreed to repay $5,105,400. The difference between the amount advanced by Sequoia and the amount that the MidCoast acquisition vehicles agreed to repay represented implicit interest.

We note that in Diebold, the Court of Appeals for the Second Circuit collapsed the transactions because it found that the shareholders had constructive knowledge of the entire scheme, including MidCoast's plan to immediately sell the target's assets.[83] In Diebold, the target corporation's shareholders sold their interests to an intermediary. The intermediary then took the target corporation's assets and sold the assets to third parties. The court found that the target corporation's shareholders knew that the initial purchaser of its shares was an intermediary because the target corporation's shareholders knew of the third-party ultimate buyers. The court explained that "[t]he Shareholder representatives also had a sophisticated understanding of the structure of the entire transaction, a fact that courts consider when determining whether to collapse a transaction and

---

[82](...continued)
received by the * * * [target corporation's] shareholders was to come from the unpaid tax liability." Feldman v. Commissioner, T.C. Memo. 2011-297, slip op. at 14.

[83]736 F.3d 172; accord Salus Mundi Found. v. Commissioner, 776 F.3d 1010.

[*64] impose liability".[84]  Specifically, the shareholders' representatives knew that the intermediary planned to sell the target's securities assets and the target's real estate assets after closing because both the securities sale and the real estate sale were alluded to in the draft agreements between the target shareholders and the intermediary.  This was enough for the Court in <u>Diebold</u> to conclude that the shareholders "'should have known' about the entire fraudulent scheme" and that "the facts * * * [in <u>Diebold</u>] demonstrate both a failure of ordinary diligence and active avoidance of the truth."[85]  The Court of Appeals found that the Tax Court's holding that the shareholder representatives were not required "to make further inquiry into the circumstances of the transaction" between the target corporation and the intermediary was "error."[86]

Unlike the target corporation's shareholders in <u>Diebold</u>, the AC shareholders and their advisers did not have constructive knowledge that MidCoast planned to sell the shares to Sequoia and that it would fail to honor the promises, representations, and warranties it had agreed to in the share purchase

---

[84]<u>Diebold Found., Inc. v. Commissioner</u>, 736 F.3d at 188.

[85]<u>Diebold Found., Inc. v. Commissioner</u>, 736 F.3d at 187-188.

[86]<u>Diebold Found., Inc. v. Commissioner</u>, 736 F.3d at 188 (quoting T.C. Memo. 2012-61, slip op. at 33).

**[\*65]** agreement. Because the Altermans lacked constructive knowledge, it is not appropriate to collapse the transactions.

    B.    <u>There Was No Constructive Fraud Under FUFTA Sec. 726.105(1)(b)</u>.

One way the Commissioner can show fraudulent transfer is under FUFTA sec. 726.105(1)(b), which is one of the constructive fraud provisions. Specifically, the Commissioner must prove that the IRS is a creditor of the debtor, regardless of whether the claim arose before or after the transfer; that a transfer was made by the debtor; that the debtor did not receive reasonably equivalent value in exchange for the transfer; and that either: (1) the debtor was engaged or about to engage in a business or transaction for which the debtor's assets were unreasonably small or (2) the debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as the debts came due.

The IRS is a creditor of AC, but the AC shareholders did not receive transfers from AC when they sold their stock to the MidCoast acquisition vehicles. And at the time AC redeemed a portion of the AC shareholders' stock, the debtor (AC) had no intent to engage in a transaction that would leave it unable to pay its debts. That intent lay hidden within MidCoast; it was not the intent of the debtor. Accordingly, the Commissioner has not met the requirements of FUFTA sec. 726.105(1)(b).

**[\*66]** C.    There Was No Constructive Fraud Under FUFTA Sec. 726.106(1).

Alternatively, the Commissioner may establish that a fraudulent transfer occurred under FUFTA sec. 726.106(1), another constructive fraud provision.  To do so, the Commissioner must prove that the IRS was a creditor before the debtor made a transfer, that the debtor did not receive reasonably equivalent value in exchange for the transfer, and that the debtor was insolvent or rendered insolvent by the transfer.

Under FUFTA a debtor can be insolvent under what is known as a "balance sheet test" if the sum of its debts exceeds the fair value of its assets,[87] and a debtor who is not paying its debts as they become due creates a rebuttable presumption of insolvency.[88]  A "debt" is a "liability on a claim."[89]  Among other things, "asset" means "property of a debtor".[90]

The Commissioner claims that the IRS was a creditor of AC before AC made a transfer.  This question turns on when a debt to the IRS was incurred.  The Commissioner argues that we should focus on when AC's assets were first sold,

---

[87]Fla. Stat. Ann. sec. 726.103(1).

[88]Fla. Stat. Ann. sec. 726.103(2).

[89]Fla. Stat. Ann. sec. 726.102(5).

[90]Fla. Stat. Ann. sec. 726.102(2).

[*67] which is when the putative tax liability arose.  Petitioners instead focus on when the return reporting that liability was due or filed.  FUFTA defines a debt as a liability on a claim[91] and further defines claims broadly to include even contingent and unliquidated rights to payment.[92]  Because debts include contingent rights to payment, the IRS' unmatured tax liability from AC's gains on the sale of its operating assets gave the IRS a claim.[93]  But that is not all that the Commissioner must prove under FUFTA sec. 726.106(1).

The Commissioner must also prove that AC made transfers to the AC shareholders without receiving reasonably equivalent value in exchange and that AC was either insolvent at the time of these alleged transfers to the AC shareholders or rendered insolvent by the transfers.  As we have previously discussed, AC did not make any transfers to petitioners in the stock sale to the MidCoast acquisition vehicles.  But even if there had been such a transfer, AC had

---

[91]Fla. Stat. Ann. sec. 726.102(5).

[92]Fla. Stat. Ann. sec. 726.102(3); Freeman v. First Union Nat'l Bank, 865 So. 2d 1272, 1277 (Fla. 2004) ("Thus, as is universally accepted, as well as settled in Florida, 'A "claim" under the Act may be maintained even though "contingent" and not yet reduced to judgment.'" (quoting Cook v. Pompano Shopper, Inc., 582 So. 2d 37, 40 (Fla. Dist. Ct. App. 1991))).

[93]See Stuart v. Commissioner, 144 T.C. at 256-259; Freeman, 865 So. 2d at 1277.

[*68] sufficient assets to cover its putative 2003 tax liability both before and after the stock sale by petitioners. Thus, it is not relevant whether there was reasonably equivalent value exchanged in the stock sale to the MidCoast acquisition vehicles. Accordingly, the Commissioner has not shown a fraudulent transfer from AC to the shareholders under FUFTA sec. 726.106(1).[94]

D.     There Was No Actual Fraud Under FUFTA Sec. 726.105(1)(a) and (2).

Another way the Commissioner can establish a fraudulent transfer is by actual fraud under FUFTA sec. 726.105(1)(a). Under this section the Commissioner must prove that the IRS is a creditor of the debtor regardless of when the claim arose and that a transfer was made by a debtor "with actual intent to hinder, delay, or defraud any creditor of the debtor."[95] Actual intent to defraud can be shown through several badges of fraud.

Badges of fraud are factors that a court can consider to determine fraudulent intent, and FUFTA includes the following 11 factors:

_____

[94]Although the Commissioner invoked FUFTA sec. 726.106, generally, neither party specifically addressed FUFTA sec. 726.106(2). That specific subsection is inapplicable because, inter alia, AC, as debtor, was not insolvent at the time of a transfer from AC to the AC shareholders.

[95]Fla. Stat. Ann. sec. 726.105(1)(a).

[*69] 1.    The transfer or obligation was to an insider.
2.    The debtor retained possession or control of the property transferred after the transfer.
3.    The transfer or obligation was disclosed or concealed.
4.    Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.
5.    The transfer was of substantially all of the debtor's assets.
6.    The debtor absconded.
7.    The debtor removed or concealed assets.
8.    The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.
9.    The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.
10.    The transfer occurred shortly before or shortly after a substantial debt was incurred.
11.    The debtors transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.[96]

The Commissioner has the burden to prove that the transfer was made "[w]ith actual intent to hinder, delay, or defraud" creditors.[97] Florida courts have held that only one badge of fraud "may only create a suspicious circumstance and may not constitute the requisite fraud" to set aside a transfer, and "several of them when considered together may afford a basis to infer fraud."[98] As noted, under FUFTA the Commissioner bears the burden of proof and must show by the

---

[96]Fla. Stat. Ann. sec. 726.105(2).

[97]Fla. Stat. Ann. sec. 726.105(1)(a).

[98]Johnson v. Dowell, 592 So. 2d 1194, 1197 (Fla. Dist. Ct. App. 1992).

[*70] preponderance of the evidence that a transfer was fraudulent.[99]  Further,

"[t]he law presumes the transaction to have been honest, that it was without fraud,

that it was for an honest purpose, and the person who asserts that it was of a

different character must prove it."[100]

In order to determine what the debtor, AC, intended at the time of the

transfer, we look to what the officers, directors, and shareholders of AC and their

advisers intended at the time.  Petitioners contend that the debtor, AC, did not

intend to hinder, delay, or defraud any creditor.  The Commissioner argues that

there are eight listed badges of fraud[101] and additional unenumerated indicators of

fraud present in these cases.  We address those in turn.

### 1.    Factor 1:  Transfer to an Insider

The Commissioner asserts that as a part of the stock sale to MidCoast AC

transferred its cash to the shareholders, who are insiders.  No such transfer

occurred.  Petitioners received cash from the MidCoast acquisition vehicles.  That

---

[99]See Wieczoreck v. H&H Builders, Inc., 475 So. 2d 227, 228 (Fla. 1985); Mejia v. Ruiz, 985 So. 2d 1109, 1113 (Fla. Dist. Ct. App. 2008); Kapila v. Plave (In re Paul), 217 B.R. 336, 337 n.2 (S.D. Fla. 1997).

[100]Tischler v. Robinson, 84 So. 914, 917 (Fla. 1920).

[101]Specifically, the Commissioner asserts factors 1, 3, 5, 6, 7, 8, 9, and 10 under Fla. Stat. Ann. sec. 726.105(2) are met.

[*71] cash came from Sequoia. The Commissioner has not proven that there was a transfer by AC of its funds to an insider.

### 2. Factor 3: Transfer Was Disclosed or Concealed

The Commissioner argues on brief that AC "concealed the transfer of cash to the AC Shareholders in the MidCoast Transaction by commingling funds in the Escrow Account." No such concealment occurred. The escrow agreement clearly called for the escrow agent, Morris, Manning & Martin, to keep the funds separate, and the AC shareholders were not paid with money from AC. Rather, they were paid with funds from the MidCoast acquisition vehicles, which had been supplied by lender Sequoia.

### 3. Factor 5: Transfer of Substantially All Assets

The Commissioner argues that AC transferred substantially all of its assets to the AC shareholders. No such transfer occurred. Although it is true that AC transferred assets, even after both the redemption and the stock sale, AC had sufficient assets to pay its 2003 tax liability. After the redemption, AC had cash of $6,455,690, prepaid taxes of $1,330,321, and a potential tax liability from the sale of its operating assets of $6,284,675, leaving AC with a net equity of $1,501,336. After the stock sale, the net equity increased slightly to $1,501,418.50.

**[*72]**      4.      Factor 6:  Debtor Absconded

The Commissioner asserts that AC absconded because it changed its name and address after MidCoast purchased the shares, it quit filing tax returns, and it was eventually administratively dissolved by the State of Florida.  The facts don't support the Commissioner's argument.  AC notified Florida's secretary of state of its name change and new address and continued to file tax returns for 2003, 2004, and 2005.  These are not actions designed to avoid detection.

      5.      Factor 7:  Debtor Removed or Concealed Assets

The Commissioner argues that AC removed or concealed assets when it deposited the 2003 tax refund of $1,329,848 it received on April 26, 2004, into its Deutsche Bank account and then subsequently transferred the same amount to the MidCoast acquisition vehicle MCC less than a month later.[102]  But caselaw holds that the "crucial issue is the intention of the transferor at the time of the transfer".[103]  At the time of the sale on December 5, 2003, AC transferred $6,455,772.50 into an escrow account, and at the end of the day the escrow agent

---

[102]We note that this transfer indicated it was for the benefit of AC.

[103]Kapila v. WLN Family Ltd. P'shp (In re Leneve), 341 B.R. 53, 61-62 (Bankr. S.D. Fla. 2006).

**[*73]** transferred AC's $6,455,772.50 to an AC account with Deutsche Bank.

Therefore, AC's assets were neither removed nor concealed.

6.  Factor 8:  Value of Consideration Received by the Debtor
    Reasonably Equivalent to the Value of the Asset Transferred

The Commissioner argues that AC did not receive reasonably equivalent

value with respect to two separate transfers.  The first transfer was the redemption

by AC of a portion of the AC shareholders' shares in exchange for Alterman

Enterprises' shares.  The second transfer relates to AC's guaranty of the Sequoia

loan.  Petitioners argue that there was reasonably equivalent value exchanged in

the redemption and that AC's liability under the guaranty of the Sequoia loan was

de minimis.

Reasonably equivalent value was exchanged in the redemption transaction

because the redemption did not favor any one shareholder over another and the

redemption did not leave AC insolvent.  All of the shareholders were redeemed in

proportion to their ownership interests in AC at the same price per share.  Further,

the main case the Commissioner cites to support his argument that reasonably

equivalent value was not exchanged in the redemption is distinguishable.  In

Robinson v. Wangemann[104] a corporation repurchased shares and gave the

---

[104]75 F.2d 756 (5th Cir. 1935)

[*74] shareholder a promissory note in exchange.[105]  At the time that the corporation repaid the note, it was insolvent.[106]  The court explained that had the shareholder been paid with cash at the time of the redemption instead of with a note, then the transaction would have been valid because at the time of the repurchase the corporation was solvent.[107]  However, the problem was that the corporation was insolvent and did not have "sufficient surplus to prevent injury to creditors when the payment" on the note was actually to be made.[108]  In contrast, AC was solvent at the time of the redemption, and it was not rendered insolvent by the redemption of the shares.  Further, there was plenty of cash left in AC to cover any putative tax it might owe for 2003.[109]

---

[105]Wangemann, 75 F.2d at 757.

[106]Wangemann, 75 F.2d at 757.

[107]Wangemann, 75 F.2d at 757 ("It may be conceded that if Arthur Wangemann had received cash for his stock at the time he relinquished it the transaction would have been valid, but that is not the case presented here.").  The Commissioner also cites In re Behr Contracting, Inc., 79 B.R. 84, 86 (Bankr. S.D. Fla. 1987), which explains:  "A corporation may not validly repurchase it's [sic] corporate stock while insolvent and the corporation receives nothing of value in exchange for the purchase price."

[108]Wangemann, 72 F.2d at 757-758.

[109]AC was incorporated under the laws of the State of Florida.  Florida corporate law provides:  "A corporation may acquire its own shares".  See Fla. Stat. Ann. sec. 607.0631(1) (West 2007).  Additionally, there is no longer a

(continued...)

[*75] AC's guaranty of the MidCoast acquisition vehicles' repayment of the loan from Sequoia was a contingent liability that did not affect AC's solvency and was not an unequal exchange as the Commissioner suggests. "It is well established * * * that a contingent liability cannot be valued at its potential face amount; rather, 'it is necessary to discount it by the probability that the contingency will occur and the liability will become real.'"[110]  Indeed, "[t]he 'fair value' of a contingent liability, of course, should be discounted according to the possibility of its ever becoming real."[111]  "[A] contingent liability is not certain--and often is highly unlikely--ever to become an actual liability."[112]

In order for the Court to count this contingent liability against AC for purposes of determining solvency and reasonably equivalent value, the Commissioner must offer evidence of the value of the guaranty and the likelihood

---

[109](...continued)
statutory prohibition against a corporation's purchasing its own shares at a time it was insolvent or would be rendered insolvent.  Compare Fla. Stat. Ann. sec. 607.0631 (West 2007) with Fla. Stat. Ann. sec. 607.017 (repealed 1989).

[110]Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.), 904 F.2d 588, 594 (11th Cir. 1990) (quoting In re Xonics Photochemical, Inc., 841 F.2d 198, 200 (7th Cir. 1998)).

[111]Advanced Telecomm. Network, Inc. v. Allen (In re Advanced Telecomm. Network, Inc.), 490 F.3d 1325, 1335 (11th Cir. 2007).

[112]In re Xonics Photochemical, Inc., 841 F.2d at 200.

**[*76]** that the guaranty would be needed to satisfy the loan repayment.[113]  The

Commissioner offered none.  The loans from Sequoia to the MidCoast acquisition

vehicles were extinguished the same day that they were entered into by the sale of

AC shares to Sequoia.  Further, MidCoast had affirmed in the share purchase

agreement that it had a net worth of over $10 million, and had there been an issue

with the loan repayment, the AC shareholders were reasonable in assuming that

MidCoast could fund the debt on its own.  Thus, the guaranty had no affect on

AC's liabilities and did not affect its solvency.[114]

Accordingly, the Commissioner's arguments do not support a finding that

reasonably equivalent value was not exchanged.

> 7.    Factor 9:  Debtor Insolvent or Became Insolvent Shortly After
> the Transfer Was Made or the Obligation Was Incurred

The Commissioner argues that AC was insolvent or became insolvent

shortly after it made a transfer.  AC was not insolvent.  Under FUFTA a debtor can

be insolvent under what is known as a "balance sheet test" if the sum of its debts

---

[113]See FDIC v. Bell, 106 F.3d 258, 264 (8th Cir. 1997).

[114]The Court of Appeals for the Eleventh Circuit explained in Advanced Telecomm. Networks, Inc. v. Allen (In re Advanced Telecomm. Network, Inc.), 490 F.3d at 1335, that zero "might be an appropriate valuation for some exceedingly remote or unlikely liabilities".  Accord Bell, 106 F.3d at 264.

[*77] exceeds the fair value of its assets,[115] and a debtor is presumed insolvent if it is not paying its debts as the debts become due.[116] Whether a transferor is insolvent must be separately determined at the time of each transfer in question.[117]

AC was not insolvent at the time of the redemption, at the time of the sale of stock to the MidCoast acquisition vehicles, or at the time AC made the loan guaranty. Immediately after the redemption, AC had net equity of $1,501,336. AC further had net equity of $1,501,418.50 immediately following the sale of stock to MidCoast on December 5, 2003. At either time, there was plenty of money for AC to pay its 2003 tax liability as it came due.

The Commissioner argues that we should take into account AC's guaranty of the MidCoast acquisition vehicles' repayment of the loan from Sequoia, but, as we have already discussed, that loan was a contingent liability that did not affect AC's solvency.

The evidence in the record does not establish that AC became insolvent shortly after the stock sale. The record is clear that AC had net equity following the stock sale, even taking into account its putative tax liability. Several days later

---

[115]Fla. Stat. Ann. sec. 726.103(1).

[116]Fla. Stat. Ann. sec. 726.103(2).

[117]Newcomb v. Commissioner, 23 T.C. 954 (1955).

**[*78]** AC's funds were moved into an account in the name of Delta Trading Partners, but there is no evidence as to who beneficially owned this account. Without any evidence of who owned the account, we cannot conclude that AC was insolvent.

        8.       <u>Factor 10: Transfer Shortly Before or Shortly After a Substantial Debt</u>

This factor turns on when a debt to the IRS was incurred. The Commissioner argues that we should focus on when AC's assets were sold, which is when the putative liability arose. Petitioners instead focus on when the return reporting that liability was due or filed.

The IRS' unmatured tax liability from AC's gain on the sale of its operating assets gave the IRS a claim, according to the broad definition of claims under FUFTA that includes even contingent and unliquidated rights to payment.[118] Thus, in a broad sense, AC had a debt for the putative tax at the time a transfer was made. But because we have found that the former shareholders did not receive a transfer from AC that left AC with insufficient assets to satisfy its tax liability, this factor does not persuade us to find actual fraud under FUFTA either.

---

[118]Fla. Stat. Ann. sec. 726.102(3); <u>Freeman</u>, 865 So. 2d at 1277.

**[\*79]**        9.        <u>Additional Badges of Fraud Cited by the Commissioner</u>

The Commissioner asserts that there are badges of fraud in addition to the enumerated factors, including unpaid State taxes and other red flags in the MidCoast transaction.  We have already addressed the red flags.  And an assumption that the AC shareholders were responsible for and did not pay State taxes[119] does not establish that the AC shareholders intended for AC to not pay its Federal tax when due.

The Commissioner has not established that AC made a fraudulent transfer to petitioners with intent to hinder, delay, or defraud the IRS.

E.        <u>Petitioners Are Not Liable as Persons for Whose Benefit AC Made Transfers Under FUFTA Sec. 726.109</u>.

The Commissioner asserts that petitioners are liable as persons for whose benefit a transfer was made.  In addition to providing a remedy against a transferee, FUFTA provides creditors a remedy against a "person for whose benefit the transfer was made".[120]  This remedy allows the creditor to "recover

---

[119]Mr. Lefcourt, the shareholders' C.P.A., testified that any failure to pay State taxes was purely an oversight.

[120]Fla. Stat. Ann. sec. 726.109(2)(a).

**[*80]** judgment for the value of the asset transferred * * * , or the amount necessary to satisfy the creditor's claim, whichever is less."[121]

In <u>Stuart</u> we explained the distinction between transferees and those who get a benefit:

> Transferees are those who receive the money or other property. Those who get a benefit because someone else received the money or property are persons for whose benefit the transfer was made. * * * The paradigm 'person for whose benefit the transfer was made' is a guarantor, who receives no money but is no longer exposed to the liability when the underlying obligation has been satisfied. * * * A person may also be a benefited person if he receives something valuable from the transferee.[122]

The Commissioner offers many alternative arguments to show that petitioners are liable as persons for whose benefit AC made transfers either to the MidCoast acquisition vehicles or to Sequoia. First, the Commissioner argues that the transfers to the AC shareholders by either the MidCoast acquisition vehicles or Sequoia were inextricably linked with the transfers from AC to the MidCoast acquisition vehicles and Sequoia. Second, the Commissioner argues that AC funds were used to repay the Sequoia loan. Third, the Commissioner argues that the transfer from AC to the MidCoast acquisition vehicles and Sequoia were

---

[121]Fla. Stat. Ann. sec. 726.109(2).

[122]<u>Stuart v. Commissioner</u>, 144 T.C. at 268 (citations omitted).

[*81] fraudulent.  Fourth, the Commissioner argues that the AC shareholders received a benefit from AC's transfer to Sequoia by receiving a premium purchase price for their AC shares.  Finally, the Commissioner argues that AC transferred its cash into the escrow account; AC agreed that its cash could be transferred to Sequoia; and had AC not transferred its funds into escrow, then the AC shareholders would not have been paid the purchase price for their shares.

Petitioners did not receive transfers from AC, and the only transfers from AC to the MidCoast acquisition vehicles were $169,679 on December 10, 2003, and $1,329,848 on May 17, 2004.[123]  Moreover, AC did not transfer funds to Sequoia.  AC transferred $16,780,000 to an account in the name of Delta Trading Partners on December 9, 2003, and there is no evidence of who beneficially owned that account or what happened to that money.  Accordingly, there is no evidence linking the transfers of AC funds to the benefit of the shareholders, and the Commissioner has not proven liability under FUFTA sec. 726.109.

---

[123]The Commissioner did not put forth evidence to show that AC was insolvent at the time of the December 2003 transfer.  Even if AC could be presumed insolvent in May 2004, the AC shareholders did not receive transfers from AC, and the Commissioner failed to prove that the transfers the AC shareholders received from the MidCoast acquisition vehicles, or alternatively from Sequoia, were fraudulent.  See infra p. 82.

**[*82]** V.  <u>Whether the Commissioner Has Proven Liability as a Transferee of a Transferee of the MidCoast Acquisition Vehicles or as a Transferee of Sequoia</u>

The Commissioner argues that petitioners are liable as "transferees of a transferee". The Commissioner asserts that both the MidCoast acquisition vehicles and Sequoia were transferees of AC and that petitioners were in turn transferees of either the MidCoast acquisition vehicles or Sequoia, hence transferees of a transferee.

The Court of Appeals for the First Circuit, in <u>Frank Sawyer Trust</u>, articulated this transferee of a transferee liability theory and added an additional necessary inquiry to the state of the law in this area.[124] The Court of Appeals held that Massachusetts' Uniform Fraudulent Transfer Act does not "require, as a prerequisite for the Trust's liability, either (1) that the Trust knew of the new shareholders' scheme or (2) that the corporations transferred assets directly to the Trust."[125] Because "[t]he IRS has presented evidence of fraudulent transfers from the four companies to various acquisition vehicles, and the acquisition vehicles

---

[124]<u>Frank Sawyer Trust of May 1992 v. Commissioner</u>, 712 F.3d at 597.

[125]<u>Frank Sawyer Trust of May 1992 v. Commissioner</u>, 712 F.3d at 599.

[*83] purchased the four companies from the Trust", there is another possible way that the Trust can be liable--as transferees of the transferee acquisition vehicles.[126]

Specifically, the test that the Court of Appeals for the First Circuit articulated in Frank Sawyer Trust was:

(1)   if the Tax Court finds that at the time of the purchases the acquisition vehicles did not receive reasonably equivalent value and

(2)   if either the transaction left the acquisition vehicles with "unreasonably small" assets, or the acquisition vehicles intended to incur a debt beyond its ability to pay,

then the Trust could be held liable for taxes and penalties regardless of whether it had any knowledge of the new shareholders' asset-stripping scheme.[127]

We must analyze each transfer that was made by AC and then follow those transfers down the line of successive transfers, evaluating whether there was a fraudulent transfer at each link in the chain of liability.[128]

---

[126]Frank Sawyer Trust of May 1992 v. Commissioner, 712 F.3d at 599.

[127]Frank Sawyer Trust of May 1992 v. Commissioner, 712 F.3d at 608.

[128]In keeping with the instruction of the Court of Appeals for the First Circuit in Frank Sawyer Trust:  "[S]o long as the * * * [shareholders were] recipient[s] of fraudulent transfers from the * * * [acquisition] vehicles, then the IRS--as a creditor of (i.e., claimant against) the * * * [acquisition vehicles]--can recover from the * * * [shareholders]."  See Frank Sawyer Trust of May 1992 v. Commissioner, 712 F.3d at 611.

[*84] The first transfer by AC was in the redemption transaction, and we have already found that was not a fraudulent transfer because reasonably equivalent value was exchanged and because AC was not insolvent after the transaction.

The next transfer AC made was to an account in the name of Delta Trading Partners, but the Commissioner has not shown sufficient evidence to establish that AC was insolvent at the time of this transfer. Indeed, there has been no evidence presented that those funds were not still under the control of, available to, or for the benefit of, AC.

The subsequent transfer was from AC to one of the MidCoast acquisition vehicles, but the Commissioner has not put forth evidence to show that AC was insolvent at the time of this transfer.

Indeed, AC cannot be inferred to have been insolvent at the time of these transfers according to the evidence we have before us. The earliest time we could infer insolvency is when the presumption of insolvency arises under FUFTA sec. 726.103(2), which provides that a "debtor who is generally not paying his or her debts as they become due is presumed to be insolvent." That first occurred when AC failed to pay its 2003 Federal tax when it became due and owing on April 15, 2004.

[*85] Even assuming AC was insolvent on April 15, 2004, and assuming the $1,329,848 transferred to the MidCoast acquisition vehicle MCC on May 17, 2004, was a fraudulent transfer, the Commissioner has failed to offer any evidence about the MidCoast acquisition vehicles' remaining assets (let alone whether they were "unreasonably small") or that the MidCoast acquisition vehicles intended to incur debt beyond their ability to pay.[129]  Accordingly, any transfer from the MidCoast acquisition vehicles to the AC shareholders cannot be fraudulent under the test outlined in Frank Sawyer Trust and applied under FUFTA.

Likewise, the Commissioner failed to offer any evidence of Sequoia's remaining assets (let alone whether they were "unreasonably small") or that Sequoia intended to incur debt beyond its ability to pay.  Accordingly, any transfer Sequoia made to the MidCoast acquisition vehicles cannot be fraudulent under the test outlined in Frank Sawyer Trust and applied under FUFTA.

VI.   Conclusion

The Commissioner seeks to impute transferee liability to petitioners for taxes that went unpaid by a corporation in which they previously owned an interest.  Petitioners took steps to ensure those taxes would get paid.  The

---

[129]We do not need to address the reasonably equivalent value prong because the Commissioner has not satisfied the second part of the test.

[*86] corporation itself remained solvent even after the shareholders sold their interests, leaving the Commissioner to argue that petitioners should be liable under a "transferee of a transferee" theory. But the Commissioner failed to show that any of the transferors were insolvent at any of the relevant times.

Although far greater in complexity, these cases are reminiscent of Terrace Corp. v. Commissioner.[130] In that case we stated:

> It may well be that respondent could have proved that the transfer which Aycock and his wife made to petitioner on July 12, 1933, was made while he was insolvent or that the transfer itself rendered him insolvent, but he did not prove it and we know of no authority for us to supply by inference what respondent has failed to prove. The statute places the burden of proof to show transferee liability upon respondent and that means that he must prove all elements which are necessary to make out a prima facie case. * * * [131]

To reflect the foregoing,

An appropriate order will be issued,

and decisions will be entered for petitioners.

---

[130]37 B.T.A. 263 (1938).

[131]37 B.T.A. at 267.